Gregory A. DAVIS, Appellant,

v.

UNITED STATES of America,
Appellee.

Leroy JOHNSON, Appellant,

v.

UNITED STATES of America,
Appellee.

Alphonzo M. BROWN, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 21723, 21779, 22101.

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 1, 1968.

Decided Feb. 18, 1969.

Petition for Rehearing Denied
March 17, 1969.

Mr. Harry E. Wood, Washington, D. C. (appointed by this court) for appellant in No. 21,723.

Mr. Stephen S. Millstein, Washington, D. C. (appointed by this court) for appellant in No. 22,101, also argued for appellant in No. 21,779. Mr. Jay S. Weiss, entered an appearance for appellant in No. 22,101.

Messrs. James S. Gardiner and John J. Baker, Washington D. C. (both appointed by this court) were on the brief for appellant in No. 21,779.

Mr. Robert S. Bennett, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker and Miss Carol Garfiel, Asst. U. S. Attys., were on the brief, for appellee.

Before TAMM, LEVENTHAL and ROBINSON, Circuit Judges.

LEVENTHAL, Circuit Judge:

The principal question raised on this appeal of three defendants jointly tried and convicted under a single-count indictment charging robbery,[1] is the trial court's ruling limiting defense counsel on the use of the complainant's record of prior convictions for impeachment purpose. We find no reversible error and affirm.

1. The background facts are developed in the testimony of Samuel Lee Evans, the victim and sole eyewitness. On Saturday, January 14, 1967, after leaving work and having a couple of beers, he walked up Seventh Street, N.W., Washington, D. C., some time past midnight. While walking in the 1500 block he "passed" a laundromat and "saw four fellows * * * standing in the window." He "glanced at them"[2] and "started to move." One of the four men, identified as Johnson, came out and asked "Where did Joe go?" Immediately thereafter, apparently, complainant was assaulted by a second man, identified as Davis,[3] and then robbed. Brown was also subsequently identified as one of the group.

Some days later Evans saw appellants at a neighborhood bar.[4] While he was

---

1. See 22 D.C.Code § 2901, as amended (Supp. I, 1968). Brown and Johnson have been sentenced to a term of 2 to 6 years, and Davis has been sentenced according to the Federal Youth Corrections Act. See 18 U.S.C. § 5010(b).

2. Evans testified that he "glanced" into the window "like that." The record is unclear as to how long or how closely

complainant observed the four men in the laundromat window.

3. Evans was firm about the identity of the accused. Defense counsel's cross-examination brought out that complainant himself characterized his observation, made at night, as a "glance."

4. Evans testified that the confrontation was "not too many days after" the rob-

sitting there Johnson and Davis, accompanied by Brown, walked in. They approached Evans and offered to sell him a coat. On the pretext of calling his wife to obtain the money Evans went and telephoned the police.

The sequence of events leading up to the arrest of appellants is somewhat unclear. Evans testified that "when the police came they [appellants] ran out and went down the street." Detective Jenkins, the plainclothesman who responded to Evans' call, arrived at the bar around 6:45 p. m. He testified that he observed appellants Davis and Brown "walking at a fast pace in the Seventh, the 1500 block." Detective Jenkins "got out of the automobile south of them while Detective Monaco pulled the cruiser up in front of them." When Detective Jenkins called Brown and Davis back, Evans made a positive identification. Within a few seconds defendant Johnson approached and inquired as to what was going on. Evans identified Johnson, and all three appellants were placed under arrest.

The three defendants each sought to establish an alibi defense. Counsel for Davis called Leola Jackson, whose daughter had "been going" with Davis at the time in question. Mrs. Jackson testified that Davis had come to her home on the evening of the 14th and left early Sunday morning around 4:00 or 5:00 a. m.[5] Her account was corroborated by her daughter. Appellant Davis also took the stand on his own behalf and denied involvement in the robbery.

The other defendants' presentations paralleled in pertinent essentials Davis's defense. Defendant Brown, like Davis, took the stand and denied participation in the crime, and counsel for both Brown and Johnson produced alibi witnesses in behalf of their respective defendants.

■ To buttress the impeachment on cross-examination of the credibility of these alibi witnesses,[6] the prosecutor recalled Detective Jenkins, who testified, over objection, that after their arrests appellants Brown and Johnson made phone calls to persons (Dolores Brown and Sandra Foster), who turned out to be their respective alibi witnesses. The prosecution sought to establish the inference that Brown and Johnson had alerted Mrs. Brown and Miss Foster to the need for an alibi.[7]

■ 2. We now focus on appellants' efforts to impeach the credibility of Evans by reference to his prior criminal record. The background facts related above highlight the character of the trial as essentially a credibility contest. Under the circumstances it was crucial that both parties be afforded every reasonable opportunity to adduce at trial evidence pertinent to the credibility of the witnesses. However, the prerogative of impeachment is subject to limitation by the trial judge in the exercise of his discretion. "[T]he ques-

bery. It appears that the arrest was January 29, 1967, two weeks after the crime.

5. Government counsel sought to undercut Mrs. Jackson's testimony by impeaching her memory and opportunity to observe, and further by establishing the groundwork for an inference that the alibi story had been planted in Mrs. Jackson's mind by defendant. The prosecutor on cross-examination sought to elicit such admission. (Tr. 116–120).

6. The prosecutor's course as to Mrs. Jackson (*see* note 5) was also followed as to the other alibi witnesses.

7. Detective Jenkins testified that both defendants asked him when and where the offense for which they had been arrested took place and related this information to the witnesses. Appellants contend that it was error to permit Detective Jenkins to testify in rebuttal solely for the purpose of impeaching credibility. We find no error. The Government was entitled to show knowledge on the part of the alibi witnesses and how they acquired it. Appellants contend also that the testimony was inadmissible hearsay. Counsel did not raise a hearsay objection at trial and, in any event, we think the ruling was correct. *See* McCormick, EVIDENCE §§ 225, 228, at 459–461, 466 (1954).

tion * * * is whether rejection of [appellants'] * * * efforts to impeach the credibility of [Evans] did not withhold from the jury information necessary to a discriminating appraisal of his trustworthiness to the prejudice of [appellants'] substantial rights." Gordon v. United States, 344 U.S. 414, 417, 73 S.Ct. 369, 372, 97 L.Ed. 447 (1953).

The record is somewhat unclear as to the precise details of Evans' prior record. Apparently between 1953 and 1966, he had been seven times convicted of major offenses.[8]

The trial judge permitted defense counsel to inquire into three of Evans' convictions: for attempted robbery, 1954; burglary, 1956; and auto theft, 1959. He excluded inquiry concerning Evans' convictions for assault, 1953; felonious assault, 1961; and assault, 1966, and also excluded inquiry as to the conviction for rape, 1963. It appears that the trial judge accepted the Government's view that the point at issue is governed by the doctrine of Luck v. United States, 121 U.S.App.D.C. 151, 348 F.2d 763 (1965).

3. There is little doubt that the ruling, if made as to impeachment of a defendant witness, would be sustained as within the ambit of the judge's discretion.[9] The rulings excluding impeachment by reference to assault and rape and permitting impeachment by reference to auto theft, robbery and burglary, fall within the guidelines developed as a "rule of thumb" in Gordon v. United States,[10] 127 U.S.App.D.C. 343, 383 F.2d 936 (1967), cert. denied, 390 U.S. 1029, 88 S.Ct. 1421, 20 L.Ed.2d 287 (1968).

Appellants' basic point is that different considerations are applicable where the witness is the complainant rather than the defendant, and that the trial judge erred in failing to take these differences into account. While there are some differences in the considerations applicable to the two types of witnesses, and in an appropriate case they may properly lead the trial judge to exercise his discretion so as to provide differences in his rulings, we do not think the differences suggest an abuse of discretion in the case at bar.

■ The similarities, indeed, loom larger in legal impact than the differences. Both defendant-witnesses and other witnesses are governed by the same statute so far as impeachment by conviction is concerned, see 14 D.C.Code § 305. This statute has been authoritatively interpreted in *Luck* to mean that prior criminal convictions are not to be automatically received into evidence for purposes of impeachment, and may be excluded by the trial judge in the exercise of his discretion:

> The statute * * * leaves room for the operation of a sound judicial discretion to play upon the circumstances as they unfold in a particular case. 121 U.S.App.D.C. at 156, 348 F.2d at 768.

The ruling establishing a discretion in the trial judge is applicable to all witnesses.

■ We have pointed out that the sound exercise of discretion should take into account the kind of conviction offered as impeachment, and that a distinction is to be drawn between acts reflecting on honesty as contrasted with

---

8. Government counsel acknowledge six convictions, and defense counsel, uncontradicted by the Government, called a seventh to the court's attention. The transcript reports as follows: 1953, assault; 1953, rape; 1954, attempted robbery; 1955, burglary; 1959, theft of motor vehicle; 1961, felonious assault; 1966, assault. (Tr. 47–48, 71). From the briefs of both counsel we infer that the transcript reference to the rape conviction as dating to 1953 is erroneous.

9. *See* Weaver v. United States, 133 U.S. App.D.C. ——, 408 F.2d 1269 (1969).

10. As to robbery, *see* Weaver v. United States, cited *supra* note 9. We assume that the burglary offense charged an entry with the intent to steal.

acts of violence, which may result from a combative nature, etc., having little direct bearing on honesty and veracity. Gordon v. United States, *supra*, 127 U.S. App.D.C. at 347, 383 F.2d at 940. Those considerations are fully applicable to all witnesses.

There is some difference between witnesses in regard to the risk to which they may be exposed. A defendant-witness runs the risk that evidence offered by way of impeachment will be used by the jury to a material extent as the basis for conviction, notwithstanding reasonable doubt as to responsibility in the case at bar, because of the human temptation to shut away a "bad man."

While that precise risk is not present where impeachment is offered against the complainant, there is the distinct possibility that the jury will acquit a man plainly guilty of crime because of their distaste for the victim. They may, for example, conclude that an established rapist is not one to complain of a street corner affray, or even robbery. The jury system that provides the sense of justice of the community may also at times inject unwelcome and unpredictable peccadillo, and even prejudice. Rules of law, however, must seek to further what the courts discern as enduring values in the administration of criminal justice. One of these, surely, is the community interest in convicting those guilty of crime, even though the particular conviction is odious for some reason.

There is a more subtle consideration involved. At a time when crime besets the inner cities where many residents have, unhappily, some criminal record, we are increasingly concerned that too many offenses go unreported, and that police protection should be increased rather than diminished in these areas. These people, too, must be assured that they have a stake in our society, and that they can achieve justice by application to the law and its guardians. Yet the rule urged by appellants with its invitation to a confusion of values would tend to go contrary to our society's basic tenets, by establishing a kind of outlaw, outside the protection of the law.

There is another difference between types of witnesses. A defendant witness has a constitutional right to refrain from testifying; other witnesses are subject to subpoena. While this is not without legal significance, it is subject to offset in the difficulties already confronting the government which must persuade witnesses to testify and to shoulder, as a cost of good citizenship, time lost, tension met, and retaliation feared.

 Generally, then, there is wide room for application of the doctrine of *Luck* and its progeny to witnesses other than criminal defendants, though there may be cases where a trial judge should make distinctions in his impeachment rulings. Here the trial judge permitted impeachment of the complaining witness with three convictions for crimes having an element of dishonesty. We cannot say there was an abuse of discretion affecting substantial rights of defendants in their inability to spice their attack on the credibility of the witness by reference to his convictions for rape and assault.

4. Appellants also contend that the trial judge committed reversible error by allowing the prosecutor to question defendants Davis and Brown about their financial condition.[11]

 Where an accused is penniless or in financial difficulties and turns up after a crime with a hefty bankroll, a trial judge may, in his discretion, permit a prosecutor to inquire into the defendant's pecuniary situation. *Compare* United States v. Daniels, 377 F.2d 255 (6th Cir. 1967). Where the evidence elicited only demonstrates that the defendant is "poor," the inquiry is improper: "Whatever probative value this evidence had, it was outweighed by its prejudicial effect." *See* United States v.

---

11. Even if we found prejudice that required reversal, we do not think that it would have infected Johnson's conviction. 

Counsel for Johnson requested no instructions limiting the use of the evidence of impecuniousness.

Mullings, 364 F.2d 173, 176 (2d Cir. 1966). There was no showing here that these particular defendants had earnings that were inadequate for their needs or that they yearned for money. The inference rested solely on the general (and impermissible) assumption that those who are not well-off cannot live within a budget and that they crave money and will commit crime to obtain it.[12] Today when the law has recognized a commitment to the underprivileged to bridge the chasm between "poor man's" and "rich man's" justice, courts must be especially alert to prevent a man's rights or liberty from turning on his economic and social status. Thus, while inquiry into an accused's financial background may be relevant to the Government's case, the prosecution must proceed gingerly in its exploration, and the trial judge should permit this inquiry only where there is a proffer that the evidence, in light of other proof, is highly probative.

■■■ While we think that the trial judge erred in countenancing this line of questioning, we do not think it requires a reversal.

We take into account that it is not one of several errors spotted, as in Mullings, supra, but rather the only one we have.[13] When the questions were put to Davis his counsel did not object to the question that elicited that Davis was making $60 per week and paying $15 rent. Objection was voiced only when Davis was asked how much he was contributing to the support of others. The reply, that Davis was contributing $10 per week for his children, may have resulted in sympathy rather than prejudice. When the trial judge noted that the question was relevant to motive, defense counsel did not object that it resulted in a prejudice that outweighs relevance.[14] Counsel for Brown did not object to this kind of questioning at all—possibly because Brown's earnings (of $45 to $65 per week) were supplemented by earnings of his wife. Johnson never took the stand so the issue never arose.

While the issue is not free from difficulty, and there would be more disposition to find reversible error if any such objections are overruled after issuance of this decision, taking the record as a whole we do not find reversible error.

Affirmed.

---

12. See II Wigmore, Evidence § 392, at 341 (3d ed. 1940):
"The *lack of money* by A might be relevant enough to show the probability of A's desiring to *commit a crime* in order to obtain money. But the practical result of such a doctrine would be to put a poor person under so much unfair suspicion and at such a relative disadvantage that for reasons of fairness this argument has seldom been countenanced as evidence of the graver crimes, particularly of violence."

13. We do not find substantial the claim raised by appellants Brown and Johnson that the prosecutor's summation contained impermissible statements of fact. The prosecutor offered her recollection of the testimony and inference she believed warranted thereby. There was no objection, motion for mistrial, or request for cautionary instruction.

14. The objection of prejudice was made (Tr. 143), but only after the line of questioning had been completed.