**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Barry Lee REID, Defendant–Appellant.**

**No. 79–1655.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 3, 1980.

Decided Dec. 24, 1980.

---

Dean B. Allison, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff–appellee.

Robert M. Viefhaus, Weisenberg, Veifhaus & Lutes, Fountain Valley, Cal., for defendant–appellant.

Before GOODWIN and ALARCON, Circuit Judges, and THOMPSON,* District Judge.

GORDON THOMPSON, Jr., District Judge:

Appellant Reid was convicted of mail fraud. The conviction stemmed from appellant's activities in connection with Eden Press, Inc. (Eden Press), of which appellant was president and sole stockholder. Eden Press produced and sold identification cards and various other items, including blank birth certificate forms, metallic Social Security card plates and pamphlet–type books.

On June 14, 1979, the Grand Jury returned a twelve–count indictment charging appellant with using the mail to carry out two separate schemes in violation of the mail fraud statute, 18 U.S.C. § 1341. These charges were based on the advertisement and sale of the Eden Press identification cards.

Counts one through six of the indictment charged appellant with a scheme to defraud the purchasers of Eden Press identification cards by leading them to believe they were purchasing official state identification cards. Eden Press's advertisements stated that the cards were "approved for every state" and that the cards were "official" or "official identification". The cards contained a state name in bold print at the top, a "registration number", and "expiration date" and a seal resembling that of the State of California. The seal bore the legend "Department of Resident Identification" around its circumference.

Counts seven through twelve of the indictment charged appellant with a plot to furnish fraudulent state identification cards for unlawful use. Upon receipt of an inquiry about its identification cards, Eden Press would send out an inquiry packet. In addition to a flier advertising the identifica-

* Honorable Gordon Thompson, Jr., United States District Judge, Southern District of California, sitting by designation.

tion cards, the packet would include fliers advertising pamphlet–type books and a catalogue card. The packet always would include a flier advertising a book called *The Paper Trip*. *The Paper Trip* flier listed such topics as: "Change your age for whatever purpose", "Avoid any or all creditors" and "Return from exile without detection". The catalogue card listed Eden Press books on subjects such as "check frauds", "con games" and "privacy from the tax man".

At the close of the government's case, the district court granted appellant's motion for judgment of acquittal as to counts seven through twelve of the indictment; the court denied appellant's motion as to counts one through six. The jury returned guilty verdicts on counts one through six.

*The Search Warrant*

On May 10, 1978, Postal Inspector Thomas C. Hall applied for and obtained a search warrant for the Eden Press offices. Appellant challenges the affidavit supporting Inspector Hall's application for the search warrant. The following numbered paragraphs summarize the contents of the affidavit.

1. The affidavit described Reid's connection with Eden Press and the nature of Eden Press's business. Eden Press designed, advertised and sold birth certificate forms and identification cards by mail order. In conjunction with these items, Eden Press marketed various books, including books entitled *The Paper Trip* and *100 Ways to Disappear and Live Free.*

2. The affiant, Postal Inspector Hall, had interviewed the publisher and principal manager of Orange City News. Orange City News had performed printing services for Eden Press since approximately September, 1976. These services included printing blank birth certificate forms, promotional flyers, mail order forms, catalogues and the Eden Press books entitled *The Paper Trip* and *100 Ways to Disappear and Live Free.*

3. The affidavit described Special Agent Meyer's interview with the publisher of the Westminister Herald. The Westminister Herald printed blank personal identification cards for Eden Press.

4. Inspector Hall set forth in the affidavit information he had obtained from Detective Clark C. Corbin of the Fountain Valley Police Department. During February and March, 1977, Detective Corbin had made several mail–order purchases of birth certificates, identification cards, books and catalogues from Eden Press. The identification cards listed fictitious names, addresses and dates of birth next to pictures of various police personnel.

5. In August, 1977, Inspector Hall had ordered an identification card and three birth certificates in the name of Thomas C. Rossi. He had received these items in the mail four days later. The affidavit described this transaction.

6. The affidavit quoted passages from the Eden Press books *The Paper Trip* and *100 Ways to Disappear and Live Free.*[1]

---

1. For example, the affidavit quoted the following excerpts from *The Paper Trip*:

"THE PAPER TRIP provides the key ingredient for escaping social control: change of identity. While the purposes for changing one's identity may be as numerous as there are individuals, the basic methods are relatively few. The degree of 'completeness' in a person's new identity will depend upon his own needs. THE PAPER TRIP details all the levels of alternate identity and the methods for creating it.

"THE PAPER TRIP is thus a plan of attack. The bureaucracies are to be rooked and conned with their rules, but without their knowledge, into creating new identities. Paper Trippers will make servants of the bu-

reaucrats, and become the rightful masters of their own lives. If freedom is to exist, we must all be free to be who we want to be. THE PAPER TRIP leads the way.

.     .     .     .     .

"Let's take a look now at some of the very basic uses for alternate identity. Although this isn't the main purpose of THE PAPER TRIP, it does help to realize that an additional ID can have many, many applications and even beneficial results. Let's get down to business.

"If you're still 'under age' the uses come immediately to mind. You might want to booze it up at a pub. You might want to be admitted to certain forms of restricted entertainment. You might want to join one of the

7. On May 2, 1978, Inspector Hall had interviewed two Eden Press employees. One employee had worked for Eden Press since March, 1976; the other had worked for Eden Press since January, 1977. The employees described the manner of processing customer mail orders and the manner of preparing the finished identification cards. The employees also provided Inspector Hall with a detailed description of the layout and contents of the Eden Press offices.

8. Inspector Hall had visited the Eden Press offices on May 5, 1978. He had observed a machine that appeared to be a camera and approximately 25–50 identification cards with photographs affixed and personal data filled in by typewriter (referred to as "mock–up" form ready for photographing). Inspector Hall also had observed cardboard boxes scattered around the room and several file cabinets.

The Eden Press offices were searched pursuant to the search warrant on May 10, 1978. The district court denied appellant's pretrial motion to suppress the evidence obtained during this search. Appellant contends that the district court erred.

█ Appellant argues that the facts in the search warrant affidavit do not establish probable cause to believe that seizable items were located in the Eden Press offices as of the date of the warrant. He argues that the information in the affidavit was not sufficiently timely. Appellant relies on several facts. The magistrate issued the warrant on May 10, 1978. The purchases by the police detective had occurred in February and March, 1977. Inspector Hall had ordered and received his fictitious identification card and birth certificates in August, 1977. Furthermore, appellant had changed the format and content of the identification cards and birth certificates in August or September, 1977, in order to comply with a preliminary injunction obtained by the Orange County District Attorney's Office. Neither the preliminary injunction nor the revised format are part of the record. Appellant contends that all criminal activity ceased when compliance with the preliminary injunction began. However, regardless of whether appellant's contention is true, we hold that the affidavit provided probable cause to believe that the items listed in the warrant could be found on May 10, 1978, at the Eden Press offices.

The warrant listed four basic types of seizable items: business records, a camera and document laminating machine, "mock–ups" of identification cards and stocks of blank identification cards and birth certificates. The business records consisted of customer lists, records of advertisements and of printing orders, financial records, original camera–ready art work, documents relating to authorship of promotional materials and documents evidencing the use of the United States mails. These are records that would be generated and maintained in

---

armed services of [sic] join yourself to another person. Maybe you want to start driving a year or so early. Whatever. Get yourself a birth certificate, using one of the several techniques to be demonstrated and you can get virtually any other kind of ID you want—and at the age you need it!

.  .  .  .  .

"When you think about it, alternate ID is used basically for two jobs. APPEARING and DISAPPEARING. You 'appear' in order to do something. You 'disappear' in order to get out of doing something. The ID you create will enable you to do whichever you like. As an example, you might want to take a greedy merchant with a check or credit game. You 'appear' as Silas Ruebottom, obtain the merchandise, and 'disappear' with the goodies having paid but a trifle. Happens all the time.

.  .  .  .  .

"Along this same line, is the practice of using a different name to rent a safe deposit box in order to hide cash, valuables, or other gain from the prying interest of the tax boys. Endless possibilities here.

"For tax purposes, or other, you might want to invest in real estate or securities, but alos [sic] want to keep these activities secret by using a solid alias. Those contemplating divorce should consider the future.

.  .  .  .  .

"In actual confidence games, impeccable ID is absolutely necessary. There are hundreds of swindles and scam operations (check and [sic] local library for several good books on the subject), but they all depend on first class ID. The same goes for ripping off merchants, professionals, banks, utilities, and insurance companies."

the ordinary course of Eden Press's business. It was reasonable for the magistrate to expect that such materials would be found at the Eden Press offices. *See, e. g., Andresen v. Maryland,* 427 U.S. 463, 479 n. 9, 96 S.Ct. 2737, 2748 n. 9, 49 L.Ed.2d 627 (1976); *United States v. Forsythe,* 560 F.2d 1127 (3d Cir. 1977).

Inspector Hall, the affiant, personally observed the second and third types of items sought–the camera and the "mock–ups" of identification cards. He set forth these observations in his affidavit. Probable cause as to these items was more than sufficient.

As to the fourth type of item sought, we will assume that only the blank birth certificates and identification cards in use prior to the August or September, 1977, format change would have constituted seizable evidence. The affidavit describes Eden Press's rather substantial orders of these items before the change in format took place. Eden Press ordered 10,000 blank birth certificates in January, 1977, and 50,000 in March, 1977. The company ordered 75,000 blank identification cards in December, 1977. If this stock was not depleted by August or September, 1977, when Eden Press implemented the format change, it would be reasonable to believe that the unused stock remained at the Eden Press offices.

■ The question is not whether there were other places to which the items might have been removed, but rather whether the facts and circumstances taken as a whole gave the magistrate probable cause to believe that the desired items would be found in the search. *United States v. Brinklow,* 560 F.2d 1003 (10th Cir. 1977). The passage of time is not necessarily a controlling factor. Both the nature of the criminal activity involved and the kind of property for which authorization to search is sought are also important factors in evaluating probable cause. *United States v. Steeves,* 525 F.2d 33 (8th Cir. 1975); *United States v. Lucarz,* 430 F.2d 1051, 1055 (9th Cir. 1970). In this case, the time lapse did not destroy probable cause. The blank identification cards and birth certificate forms were not particularly incriminating in themselves; without evidence of appellant's intent to defraud, these items would have been of little consequence. The magistrate reasonably could infer that Eden Press would have stored its unused stock in its offices. The district court correctly upheld the search warrant.

*Prior False Statements*

Appellant raises only one other issue worthy of discussion here. He contends that the district court erred in permitting limited use of appellant's prior false statements for impeachment on cross–examination.

Appellant testified at the trial. He described the development of Eden Press's business. Initially, Eden Press had only sold appellant's book about identification, *The Paper Trip.* The identification card business had evolved from sales of *The Paper Trip.*

On cross–examination, the prosecutor questioned appellant concerning false statements in a letter appellant had written to a government agency while researching *The Paper Trip* in 1971. Appellant admitted that he had falsified his name, his occupation, the name of his business and his purpose in seeking information about official government identification. In each instance, the prosecutor simply asked appellant whether he had made the false statement. The letter itself was neither offered nor admitted into evidence. Appellant contends that the district court erred in allowing the prosecutor to ask questions about this letter.

■ Appellant placed his credibility in issue when he took the witness stand. Cross–examination concerning the false statements in the letter was entirely proper to impeach appellant's general credibility. Fed.R.Ev. 608(b)(1) gives the trial court discretion to permit cross–examination of a witness regarding specific instances of conduct concerning that witness's character for truthfulness or untruthfulness. The impeachment in the instant case consisted of appellant's own admissions of previous falsehoods. These falsehoods were proba-

tive of appellant's lack of truthfulness. *See Lyda v. United States*, 321 F.2d 788 (9th Cir. 1963). The fact that appellant made the false statements eight years prior to trial did not destroy the relevance of the statements for impeachment purposes. The district court did not abuse its discretion in allowing the prosecutor to elicit admissions from appellant as to his deliberate use of false statements in 1971.

Appellant's remaining contentions are without merit. The judgment is affirmed.