**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**MacDonald Julius JACKSON,
Defendant–Appellant.**

No. 87–5010.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 2, 1989.

Decided Aug. 16, 1989.

Mary F. Gibbons, Beverly Hills, Cal., for defendant-appellant.

Michael W. Emmick, Asst. U.S. Atty., Chief, Crim. Complaints, Los Angeles, Cal., for plaintiff-appellee.

Before SNEED, REINHARDT and BRUNETTI, Circuit Judges.

SNEED, Circuit Judge:

Jackson appeals his convictions in connection with a scheme to receive fraudulent tax refunds. He argues that the trial court committed prejudicial error in admitting and excluding certain evidence. We affirm.

## I.

### FACTS AND PROCEEDINGS BELOW

Jackson was convicted of one count of conspiracy, ten counts of making fraudulent claims, and ten counts of mail fraud. See 18 U.S.C. §§ 287, 1341 (1982 & Supp. IV 1986).

Jackson, along with codefendant John Speidel, devised a scheme to submit to the IRS 101 tax returns on behalf of fictitious taxpayers in order to receive refunds. Speidel pleaded guilty and agreed to cooperate with the government. He testified that he and Jackson agreed that Speidel would prepare false returns and W–2 forms. These fictitious taxpayers' addresses would be listed at a commercial post office box. Speidel testified that Jackson agreed to rent the post office box, collect the tax refund checks, and cash them. Speidel also testified that Jackson called him and furnished a post office box number.

Henderson, an acquaintance of both men and an unindicted coconspirator cooperating with the government, testified that he and Jackson rented the post office box. He testified that he checked the box periodically but that he only received one letter and it was from the IRS. He also testified that Jackson told him about the fraudulent scheme. Henderson was arrested after checking the box on one occasion and agreed to cooperate with the government by having his phone calls with Jackson recorded. During these recorded conversa-

**1446**

tions, Jackson was evasive and denied knowing Speidel.

Laura Speidel, the daughter of John Speidel, testified that Jackson called her father and left a four-digit number that was for a "p.o. box." She also testified about her participation in this scheme. The trial court, however, prohibited Jackson's counsel from cross-examining her about her participation in other fraudulent transactions with her father.

Jackson took the stand and testified on his own behalf. He denied any participation in or knowledge of the scheme. On cross-examination, the government impeached Jackson, a disbarred attorney, by showing that he had been disciplined for misappropriating a client's funds fourteen years ago.

After his conviction, Jackson was sentenced to two years imprisonment on all counts but the sentence was suspended as to all but the first count. The suspended sentence is to be served at the conclusion of the term of imprisonment.

## II.

### JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231 (1982). This court can review the defendant's conviction under 28 U.S.C. § 1291 (1982).

## III.

### STANDARD OF REVIEW

The district court's determination of the scope of cross-examination is reviewed for abuse of discretion. *United States v. Kennedy,* 714 F.2d 968, 973 (9th Cir.1983), *cert. denied,* 465 U.S. 1034, 104 S.Ct. 1305, 79 L.Ed.2d 704 (1984). The same standard governs our review of the district court's admission of evidence. *See United States v. Burreson,* 643 F.2d 1344, 1349 (9th Cir.), *cert. denied,* 454 U.S. 830, 102 S.Ct. 125, 70 L.Ed.2d 106 (1981).

## IV.

### ANALYSIS

#### A. *Laura Speidel's Cross-examination*

The trial court may permit a party to cross-examine a witness about specific instances of misconduct if they are probative of truthfulness or untruthfulness. *See* Fed.R.Evid. 608(b). Jackson argues that the district court abused its discretion in prohibiting his cross-examination of Laura Speidel about her participation in other fraudulent schemes with her father. She did testify, however, that she had helped Jackson prepare false financial reports. The error was particularly harmful, Jackson argues, because this case turned on the credibility of the witnesses for each side. *See United States v. Ray,* 731 F.2d 1361, 1364 (9th Cir.1984) (if the government's case rests on the credibility of a witness, the defendant must be accorded broad latitude in cross-examination).

██ Jackson correctly points out that evidence of a witness' participation in fraudulent transactions is probative of truthfulness. *See, e.g., United States v. Sperling,* 726 F.2d 69, 74–75 (2d Cir.) (false credit card applications), *cert. denied,* 467 U.S. 1243, 104 S.Ct. 3516, 82 L.Ed.2d 824 (1984); *United States v. Carlin,* 698 F.2d 1133, 1137 (11th Cir.) (false license applications), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983); *United States v. Reid,* 634 F.2d 469, 473–74 (9th Cir.1980) (prior false statements), *cert. denied,* 454 U.S. 829, 102 S.Ct. 123, 70 L.Ed.2d 105 (1981).

In addition, there are three cases in which a defendant's conviction has been reversed based on the trial court's failure to allow inquiry into prior acts of misconduct. In *Ray,* on which Jackson relies, the district court refused to permit defense counsel to inquire whether the government's main witness continued to sell cocaine after his arrest. *See* 731 F.2d at 1363–64. The court held that this was error because this witness could provide the only testimony which linked the defendant to the conspiracy to distribute cocaine. *Id.* at 1364. Similarly, in *United States v.*

*Calle,* 822 F.2d 1016, 1020–21 (11th Cir. 1987), the Eleventh Circuit held that the district court erred in refusing to allow a rebuttal witness to testify that the government's "star" witness was a major drug-trafficker and not the "small-time drug user" as he was portrayed. In concluding that the error was prejudicial, the court noted that this witness provided the only first-hand evidence to link the defendant to the drug conspiracy. *Id.* at 1021. Finally, in *United States v. Leake,* 642 F.2d 715 (4th Cir.1981), the district court refused to permit the defendant to cross-examine a government witness about allegations that he obtained money under false pretenses, defrauded an innkeeper, wrote six insufficient checks, and had a number of default judgments entered against him. *Id.* at 719. Because this witness was crucial to the government's case, the Fourth Circuit reversed Leake's conviction. *Id. But see United States v. Vinson,* 606 F.2d 149, 155–56 (6th Cir.1979) (holding there was no error in refusing to allow cross-examination of a government witness about a prior scheme to bribe the defendant, in prosecution for bribery), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980).

■■ The trial court properly could have admitted evidence of Laura Speidel's participation in the fraud. We do not think, however, that it was reversible error not to permit its admission. The court's refusal to admit the evidence was not, we hold, an abuse of discretion. In reaching this conclusion, we must determine " 'whether the jury had sufficient information to appraise the bias and motives of the witness.' " *Ray,* 731 F.2d at 1364–65 (quoting *Skinner v. Cardwell,* 564 F.2d 1381, 1389 (9th Cir.1977), *cert. denied,* 435 U.S. 1009, 98 S.Ct. 1883, 56 L.Ed.2d 392 (1978)). That is, the crucial issue is whether the jury had sufficient evidence from which to evaluate Laura Speidel's testimony. Laura Speidel had testified that she prepared fraudulent loan applications with the defendant previously. The trial court need not over-emphasize the untrustwhiness of a witness by permitting cumulative impeachment. *See United States v. Monks,* 774 F.2d 945, 953 (9th Cir.1985) (no error in

refusing cross-examination of a government witness concerning a prior burglary when the witness was impeached with a bank robbery conviction and admitted to a drug habit). Maintaining the proper balance between the impeachment tactics of the prosecution and the defense is a quintessentially discretionary task of the district judge.

Here, unlike *Leake, Calle,* or *Ray,* Laura Speidel's testimony was not crucial to the prosecution's case. It concerned the telephone call from Jackson about the post office box number. Henderson recounted the details surrounding the renting of the post office box, as did Jackson during his own testimony. The jury already knew that Laura Speidel had a strong bias in favor of her father. It cannot be said that the jury did not have a sufficient basis upon which to evaluate her testimony. *See United States v. Fortna,* 796 F.2d 724, 734–35 (5th Cir.) (holding that although the district court may have abused its discretion, any error in limiting cross-examination of a government witness was harmless when the witness was not that significant and evidence of her possible bias was disclosed), *cert. denied,* 479 U.S. 950, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986). As a result, we conclude that this evidence could not have affected the verdict. *See United States v. Faust,* 850 F.2d 575, 585 (9th Cir.1988) ("A trial court's evidentiary ruling will be reversed only ... if that evidentiary error would have more likely than not affected the verdict.").

*B. Impeachment of Jackson*

Jackson, a disbarred attorney, testified on his own behalf. The government impeached Jackson with a signed statement indicating that fourteen years before he had been disciplined for misappropriating client funds. On appeal, Jackson argues that this evidence was too remote to be probative and that the district court violated rule 608(b) by allowing the government to introduce extrinsic evidence of this prior act of misconduct.

As originally proposed Fed.R. Evid. 608(b) prohibited the admission of remote acts of misconduct. In order to encourage flexibility, Congress deleted this requirement. *See* 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 608[05] at 608–49 (1988). Nonetheless, remoteness remains a relevant factor for the trial court to consider in assessing the probative value of the evidence. *See United States v. Kennedy*, 714 F.2d 968, 973 (9th Cir.1983), *cert. denied*, 465 U.S. 1034, 104 S.Ct. 1305, 79 L.Ed.2d 704 (1984); *United States v. McClintic*, 570 F.2d 685, 691 n. 6 (8th Cir. 1978). Courts have permitted the government to use older acts of misconduct for impeachment under rule 608(b). *See, e.g., United States v. Reid*, 634 F.2d 469, 473 (9th Cir.1980) (no error in admission of false statements made eight years before), *cert. denied*, 454 U.S. 829, 102 S.Ct. 123, 70 L.Ed.2d 105 (1981); *McClintic*, 570 F.2d at 690–91 (trial court properly admitted evidence that five years before defendant had attempted to swindle an undercover FBI agent). The case most in point is *United States v. Weichert*, 783 F.2d 23 (2d Cir.), *cert. denied*, 479 U.S. 831, 107 S.Ct. 117, 93 L.Ed.2d 64 (1986) (per curiam), in which the Second Circuit held that the government could cross-examine the defendant about his disbarment twelve years before. *Id.* at 25–26. "That the disbarment occurred twelve years before the trial decreased its probative value but did not require exclusion." *Id.* at 26. We agree with this view. The evidence of Jackson's misappropriation was particularly probative of his truthfulness. We refuse to disturb the trial court's assessment of the probative value of the evidence.

Jackson next contends that the government violated Fed.R.Evid. 608(b) by using his sworn statement to impeach him during cross-examination. On cross-examinations, the Assistant United States Attorney (AUSA) attempted to impeach Jackson with a sworn statement in which he admitted misappropriating $2500 from a former client, Randolph. Jackson alternatively admitted and denied that Randolph was a client, that he was paid a fee, and that he borrowed $2500. In an effort to impeach Jackson, the AUSA showed him a statement, asked him if he had signed it, and then asked Jackson: "Do you admit or deny that you willfully failed and refused to pay Mr. Randolph the $2500 ...?" Jackson admitted the statement was true. Then the AUSA asked: "Do you admit or deny that you willfully misappropriated the sum of $2500 for your own use from Mr. Randolph?" Jackson again admitted the statement was true. The document was never admitted into evidence.

Rule 608(b) provides that "[s]pecific instances of misconduct ... may not be proved by extrinsic evidence. They may, however, in the discretion of the trial court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination." Thus, as applied to this case, the prosecutor could impeach Jackson with the information concerning the misappropriation of client funds. *See United States v. Whitehead*, 618 F.2d 523, 529 (4th Cir.1980) (stating that the government could properly cross-examine defendant concerning his suspension from the practice of law).

Rule 608(b) is limited by the prohibition against the use of extrinsic evidence. This rule has been interpreted to prohibit the admission into evidence of documents or testimony by another witness to prove prior misconduct not resulting in a conviction. *See, e.g., United States v. Lew*, 875 F.2d 219, 223 (9th Cir.1989) (testimony); *In re Gulph Woods Corp.*, 82 B.R. 373, 375 (Bankr.E.D.Pa.1988) (documents). *See generally* 3 J. Weinstein & M. Berger, *supra* ¶ 608[05], at 608–28 n. 3 (collecting cases). Thus Jackson contends that although the government could properly cross-examine him concerning his prior misconduct, its use of the written statement violated the prohibition against the use of extrinsic evidence.

In making this argument, Jackson has not cited a case nor have we found one in which a court has held that Rule 608(b) was violated when the extrinsic evidence, whether or not embodying admissions by the defendant, was not introduced into evidence. We are prepared to rest on our interpretation of Rule 608(b), particularly

because the same result can be reached under Fed.R.Evid. 613(b). That rule permits the use of extrinsic evidence to show a prior inconsistent statement by a witness. If the witness is a party, as in this case, the admission of prior inconsistent statements is governed by Fed.R.Evid. 801(d)(2). *See* Rule 613(b). Rule 801(d)(2)(A) provides that an admission by a party is not hearsay.

Thus, in this case, the government could properly impeach the defendant with the evidence of the disciplinary action. When the defendant attempted to deny the event, the government could then use the signed document as an admission of prior misconduct. *See, e.g., United States v. Moran*, 759 F.2d 777, 786 (9th Cir.1985) (upholding introduction of documents into evidence showing admissions of defendant), *cert. denied*, 474 U.S. 1102, 106 S.Ct. 885, 88 L.Ed.2d 920 (1986).

### C. *Testimony about Jackson's financial difficulties*

■ The trial court permitted John Speidel to testify that Jackson was "short on funds" and having "financial difficulty." He also testified that Jackson "borrowed occasionally some money from me, and he couldn't pay for things he needed to have done." The government mentioned this testimony during its final argument. Jackson contends that this evidence was inadmissible because it unfairly prejudiced him. The prosecution argued that the evidence was admissible to prove motive.

In *United States v. Reed*, 700 F.2d 638 (11th Cir.1983), the Eleventh Circuit held that the district court erred in admitting evidence that the defendant had filed for chapter 13 bankruptcy two years previously. The court did not address whether this error would have been prejudicial because it reversed the conviction on other grounds. *Id.* at 642. The court recognized "evidence of [an] imminent financial burden" is admissible to prove motive, but held that the fact that the defendant had filed for bankruptcy did not suggest that he committed the crime for financial gain. There was no evidence that the defendant was under any

financial pressure. The court also cautioned that juries must not be permitted to assume that just because the defendant is poor he is likely to commit a crime to obtain money. *Id.* at 643.

Resistance to linking poverty with motivations to commit crimes appeared in two other cases. In *United States v. Zipkin*, 729 F.2d 384 (6th Cir.1984), the court reversed the defendant's conviction based on the improper admission of other evidence. For the benefit of the district court on remand, the court discussed the admission of records that showed that the defendant earned only $6,000 practicing law. *Id.* at 389. The court held that "a trial court should be extremely cautious in admitting such evidence and the Government must have more than mere conjecture that impecuniosity was a motive lest the poor be in position of being at greater suspicion of having committed a crime...." *Id.* at 390–91; *see also Davis v. United States*, 409 F.2d 453, 457–58 (D.C.Cir.1969) (holding that a district court should admit evidence that a defendant is of modest means only when it is "highly probative" of motive).

In contrast, those courts admitting evidence of financial motive have been confronted with more than the mere fact that the defendant is poor. For example, in *United States v. Saniti*, 604 F.2d 603, 604 (9th Cir.) (per curiam), *cert. denied*, 444 U.S. 969, 100 S.Ct. 461, 62 L.Ed.2d 384 (1979), this court upheld the admission of evidence that defendant had a $250 per day heroin habit in his prosecution for bank robbery. "Evidence that tends to show that the defendant is living beyond his means is of probative value in a case involving a crime resulting in financial gain." *Id.; see also United States v. Feldman*, 788 F.2d 544, 557 (9th Cir.1986) (evidence showed that defendant owed substantial sums of money), *cert. denied*, 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987); *United States v. Reed*, 639 F.2d 896, 907 (2d Cir.1981) (defendant was eight months behind in mortgage payments); *United States v. Gorel*, 622 F.2d 100, 105 (5th Cir.1979) (defendant lost $41,000 in an unsuccessful investment), *cert. denied*, 445

U.S. 943, 100 S.Ct. 1340, 63 L.Ed.2d 777 (1980).

In this case the testimony concerning Jackson's financial troubles was somewhat vague. However, while the evidence was not as specific as in *Saniti*, it was not as generalized as that in *Reed, Zipkin,* or *Davis*. We do not believe Jackson was prejudiced by this testimony. Henderson testified that he was surprised when Jackson paid $100 for the post office box because he never had any money. Thus, Jackson's financial condition was disclosed to the jury in an entirely proper way. While poverty alone does not indicate a motive to commit, or the commission of, a crime, an unexplained and abrupt change in that status for the better might. *Cf. United States v. Mennuti*, 679 F.2d 1032, 1037 (2d Cir.1982) (no error in admitting evidence showing defendant's potential profit in insurance scheme). Further, although vague, the prosecutor did not argue that Jackson was poor and therefore he participated in this scheme. We cannot conclude that the admission of this evidence was error, nor can we conclude that any error was likely to have affected the verdict. *See Faust*, 850 F.2d at 585.

AFFIRMED.

REINHARDT, Circuit Judge, dissenting:

Appellant Jackson raises three issues in this appeal. The majority, in abbreviated fashion, dismisses each in turn. I find its perfunctory treatment of Jackson's claims especially troubling because of the importance of some of the questions presented.

The rules surrounding testimony by the defendant permit the introduction of character and prior conduct evidence, evidence unrelated to the enumerated charges. This practice carries with it the risk that jurors may convict a defendant not for the offense he is charged with but because of a general belief that he is a "bad actor." For example, nothing is so damaging to a defendant's chances for acquittal as the introduction of evidence that he has previously been convicted of a felony. Given these realities, we have an affirmative obligation to scrutinize carefully the introduction of evidence not directly relevant to the crime charged. Because I believe that at least two of appellant's objections to the use of such evidence are correct, I dissent.

1. At trial, the prosecution introduced evidence from a fourteen year old bar disciplinary hearing. I agree with the majority that there is no specific time limitation on prior bad act evidence and that the district court has broad discretion in weighing the admissibility of evidence. That being said, I have grave doubts about the introduction of such attenuated evidence against the defendant. As Judge, now Justice, Kennedy said for the court, "Since ... [the defendant's] involvement was more than ten years old, it detracted only minimally from his credibility.... Disclosing it in court was likely to unduly prejudice the jury." *United States v. Kennedy*, 714 F.2d 968, 973 (9th Cir.1983). Fourteen years is substantially more remote than any other bad act evidence ever upheld in this circuit and approximately two years more remote than any bad act ever admitted in any other circuit, if we are to judge by the majority opinion. It seems clear to me that the majority is pushing the limits of discretion, if it has not already broken them. While it is not necessary for me to say which, because in my opinion the way in which the cross-examination on this point was conducted constitutes error, I would suspect the latter to be the case.

The district court not only allowed the defendant to be questioned by the prosecution regarding the old disciplinary action, it permitted the prosecution to impeach him with extrinsic evidence of his prior bad act. The use of such extrinsic evidence is prohibited. The language of Federal Rule of Evidence 608(b) is clear. "Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility ... may not be proved by extrinsic evidence." By its explicit terms, the Rule forbids the precise practice that the district court permitted in this case. *See United States v. Whitehead*, 618 F.2d 523, 529 (4th Cir.1980) (documents of bar disciplinary proceedings).

The majority attempts to elude the restraints imposed by Rule 608(b) by means of two arguments. First, it argues that the defendant's signed statement was never introduced into evidence and, thus, falls beyond the reach of the Rule. The majority's description of events is somewhat disingenuous, because the signed statement was marked into evidence and was a focal point of the cross-examination.

At the beginning of the cross-examination, Jackson was questioned about misappropriating funds from a former client. When he attempted to answer the questions in a manner inconsistent with the signed statement, the prosecution confronted him with the statement and impeached him in front of the jury.

Q: "Sir, you asked him to loan you $2,500 for a period of two weeks. Is that correct?"

A: "No, that is not correct. I know what you are reading from, but I am under oath, also. You asked me a question, and I am answering it."

After the prosecution placed the statement in front of the defendant and forced him to acknowledge his signature, the following exchange completed this portion of cross-examination.

Q: "Do you admit or deny that you wilfully misappropriated the sum of $2,500 for your own use from Mr. Randolph?"

A: "Well, I signed that statement. Yes."

Q: "Do you admit or do you deny it?"

A: "Do you want to know what happened, or do you want to know whether I signed the statement admitting it? Yes, I signed it admitting it."

These exchanges make clear that the prosecution effectively used the written statement at trial. In doing so, it proved the witness' prior bad conduct through the use of extrinsic evidence. Although the written statement was ultimately not introduced at trial (nor did it need to be since the prosecution had accomplished its purpose without formal introduction), this is irrelevant to the question of whether facts were proved through extrinsic evidence within the meaning of the Rule. It is per-

fectly apparent to me that marking the statement and forcing Jackson to acknowledge its accuracy to the jury constituted extrinsic proof of the bad act in contravention of the language of the Rule.

Moreover, the prosecution's use of the evidence at trial not only contradicts the plain language of the rule, it also contravenes the policy underlying the Rule. The purpose of the Rule is three-fold: to limit the degree to which trials become mired in collateral issues, to reduce the surprise of a witness suddenly faced with evidence which would require rebuttal witnesses or documentation, and to curtail the risk of prejudice which "unavoidably attends the introduction of evidence of specific bad acts, since juries are likely to misuse such evidence, particularly (though not only) when the witness in question is a party." 3 D. Louisell & C. Mueller, *Federal Evidence* § 306 (1979). *See also* 3 J. Weinstein & M. Berger, *Weinstein's Evidence* § 608[05] (1988).

The use of the evidence in this case implicates all three concerns. First, after the prosecution used the statements to impeach the defendant, the district court would, in fairness to Jackson, have had to let him introduce rebuttal evidence about the bar disciplinary hearing and the purported misappropriation. If, in fact, Jackson had an excuse or contradictory evidence, he had the right to present that evidence. This could have turned the case into a mini-trial over only slightly relevant evidence and mired the participants in a lengthy, collateral dispute. Second, the fact that, in this case, there was no such collateral litigation could conceivably reflect the defense's surprise about the evidence. Appellant may simply not have had the time or resources to accumulate the evidence necessary to rebut the collateral charge. This is, of course, one of the evils the Rule was specifically designed to avoid. Third, the fact that the prior bad act was the subject of a bar disciplinary proceeding and that the defendant confessed to judgment raises a strong possibility that the jury would misuse and overemphasize the evidence against the defendant.

Moreover, the procedure envisioned by Rule 608(b) was that the cross-examiner could question the witness on the prior acts but ultimately would have to "take the answer of the witness." If the witness does not come forth with an answer that the attorney finds satisfactory, he make seek an admission through further cross-examination. *See* 3 Louisell & Mueller, *supra.* Irrespective of whether the answer from the stand is truthful or not, the Rule plainly bars further inquiry into the substance of the bad act, either by use of evidence derived from the witness or other sources.[1]

The majority also claims that Rule 608(b) is not properly at issue here because the signed statements constitute a prior inconsistent statement under Rule 801(d)(2) and Rule 613(b). Rule 801 simply defines the written statements as nonhearsay. The Rule is one of competency, not of admissibility. Rule 613(b) lays out prerequisites for impeachment evidence of witnesses, prerequisites that may or may not have been met in this case. However, Rule 613(b), like all the other rules of evidence, is still subject to the specific exclusion principles set forth elsewhere in the rules. Since Rule 608(b) specifically requires exclusion of the statements here, the fact that the statements would have been otherwise admissible under 613(b) or 801(d)(2) is irrelevant.

2. At trial, John Speidel testified that appellant was "short on funds" and was suffering from "financial difficulty." He further stated that Jackson "couldn't pay for things he needed to have done." As the majority opinion accurately recounts, the prosecutor argued to the jury that the defendant's poverty was the motive for Jackson to violate federal law.

The majority opinion contains an accurate recitation of the various opinions on the question of introducing evidence of poverty to support theories of criminal motivations. But my colleagues, like the evidence against appellant, are "somewhat vague" as to the policy behind the rule and the source of our reluctance to admit proof of mere impecuniosity.

The prosecution introduced the evidence of Jackson's general financial shortcomings to demonstrate that he had a motive to commit the charged crimes. On a purely theoretical level, I have little quarrel with the government's argument that there is some statistical correlation between poverty and crime. Many of the problems of our society, both in terms of crime or otherwise, can be traced to systemic and pervasive poverty, especially in the inner cities. Nevertheless, even if there is a link between poverty and crime,[2] we have consistently excluded generalized evidence of poverty on the ground that this evidence wrongly casts suspicion on the disadvantaged and affords them unequal treatment with members of more privileged classes; "the practical result ... [of admitting evidence of poverty] ... would be to put a poor person under so much unfair suspicion and at such a relative disadvantage that for reasons of fairness this argument has seldom been countenanced as evidence of the graver crimes ..." 2 Wigmore, *Evidence,* § 392 (Chadbourn rev. 1979).[3] *See also United States ex rel. Mertz v. New Jersey,* 423 F.2d 537, 542 (3d Cir.1970). I suspect

---

1. While some might object to a process that facilitates perjury, there are clear incentives for witnesses to tell the truth at trial, not least among them is the threat of later prosecution for perjury.

2. Some courts have rejected poverty evidence on strict relevancy grounds. "It is doubtless true that in a large class of cases the poverty or pecuniary embarrassments of a party accused of crime cannot be shown as substantive evidence of guilt. The reasons for the exclusion of such evidence is that in those cases there is no certain or known connection between the facts offered to be proved and the conclusion which is sought to be established by it. It does not

follow, because a man is destitute, that he will steal, or that when embarrassed with debt and incapable of meeting his engagements he will commit forgery ..." *Commonwealth v. Jefferies,* 7 Allen 548, 565 (Mass.1863). Although Chief Justice Bigelow's theory in *Jefferies* has a certain attraction, I would side with the more modern approach which argues for exclusion not on relevancy grounds but on the theory that the prejudicial effect outweighs the probative value under Fed.R.Evid. 403.

3. Professor Wigmore argues that the rule barring admission of evidence of general poverty should apply principally to crimes of violence and may not apply to merely "peculative crimes

that poor people are already sufficiently disadvantaged by our criminal justice system that we do not need to invite images of stereotype and prejudice into the jury box.

There are times, however, when federal courts have admitted proof of financial need in support of motivation. These cases involve more than mere impecuniosity; rather, they rely on the defendant's *specific* and *immediate* need for funds. *See United States v. Feldman*, 788 F.2d 544, 556–57 (9th Cir.1986) (overdrawn bank account); *United States v. Saniti*, 604 F.2d 603, 604 (9th Cir.1979) (per curiam) (drug habit). Thus, the evidence involves substantially more than the mere suggestion that those who are poor are more likely to turn to crime. When the prosecution has attempted to introduce generalized evidence of monetary need that is shared by a great number of people, the federal appellate courts have been virtually unanimous in their condemnation of that evidence. *See, e.g., United States v. Zipkin*, 729 F.2d 384 (6th Cir.1984); *United States v. Reed*, 700 F.2d 638, 642–43 (11th Cir.1983).

The majority recognizes the distinction between generalized evidence of poverty shared by many people and the specific and immediate need that marks admissibility. However, without explanation, it baldly states that "short on funds" comes closer to the latter than to the former. This claim borders on the fanciful. The evidence in no way suggested that Jackson was operating under an imminent possibility of financial collapse but instead reflected a status that millions of poor and, indeed, middle class people share these days. It seems clear to me that appellant's predicament falls within the cases barring admission of evidence. While the error standing alone may not require reversal, when combined with the other errors described above, it warrants a new trial. I dissent.

(such as larceny or embezzlement)." I, however, believe that the principles supporting the general rule adhere with equal force in the latter context. In fact, because the relationship between poverty and economic crimes may be even stronger in the minds of a jury, the prejudicial effect in such cases is undoubtedly greater.