990 F.2d 1265
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Margo THIBAULT-LEMKE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
William E. LEMKE, Defendant-Appellant.
 Nos. 91-50774, 91-50860.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Oct. 5, 1992.*
Decided March 17, 1993.
 
 Before HUG, FLETCHER and BRUNETTI, Circuit Judges.
 
 
 1
 Appellants William E. Lemke ("Lemke") and Margo J. Thibault-Lemke ("Margo")[1] appeal their criminal convictions and sentences for engaging in a murder-for-hire scheme. Margo was charged with eight violations of 18 U.S.C. § 1958 ("use of interstate commerce facilities in the commission of murder-for-hire") (Counts One through Eight), five counts of wire fraud in violation of 18 U.S.C. § 1343 (Counts Nine through Thirteen), and a single count of conspiracy in contravention of 18 U.S.C. § 371 ("conspiracy to commit offense or to defraud United States") (Count Fourteen). Lemke was charged with two of the § 1958 counts (Counts Two and Four), all five wire fraud counts, and the conspiracy count.
 
 
 2
 The jury returned verdicts of guilty against Margo on Counts One through Six, Nine through Eleven, and Fourteen, and against Lemke on Counts Two, Four, Nine through Eleven, and Fourteen. The trial judge declared a mistrial as to Counts Seven, Eight, Twelve, and Thirteen. Margo is currently serving a sentence of 126 months. Lemke is serving a ninety-month sentence.
 
 
 3
 Appellants raise five arguments jointly; Lemke raises three additional ones. We reject all eight contentions and affirm appellants' convictions.
 
 I. Facts
 
 4
 This is the tale of a tragicomic murder-for-hire scheme. Margo and Lemke conspired to kill Margo's estranged husband, Richard Thibault ("Richard"), and collect the proceeds from two life insurance policies. Inept planning and execution doomed the plot from the beginning. In fact, the probation officer preparing Margo's pre-sentence investigation report noted that Richard, the intended victim, "did not realize that ... repeated attempts [had been made] to have him killed until much later when the case was going to trial."
 
 
 5
 Margo married Richard in 1983. They lived together in Tustin, California, until July 1987, when Richard apparently discovered that Margo was having an affair with Lemke. Richard moved out, and filed for divorce shortly thereafter.
 
 
 6
 Both of the insurance policies at issue named Margo as beneficiary. After Richard left their Tustin home, Margo fraudulently increased the coverage on an American Express policy from $100,000 to $200,000 by forging Richard's signature on a request for increased benefits. She also purchased a $100,000 policy from AIG Life Insurance Co., again forging Richard's name.
 
 
 7
 Four different individuals were hired at different times to do the actual killing. One of these individuals, David "Jan" Lamb, a transsexual then dressing as a woman and undergoing preliminary procedures for a sex-change operation, apparently got cold feet midstream, contacted police in Thornton, Colorado, and disclosed the murder plot. Monitored telephone calls between Lamb and Margo were, as Margo's attorney put it, "admittedly incriminating"; in them, Margo (1) advised Lamb to lie low for the time being because it would cause suspicion for Lamb "to come here, and have Richard come up dead, for god's sake";[2] (2) assured Lamb that if Richard was still covered by the insurance policies she would pay Lamb $10,000 for killing her estranged husband; and (3) questioned Lamb about how to kill Richard using curare, a poison. Government's ER at 10-29.
 
 
 8
 We have jurisdiction over these timely appeals pursuant to 28 U.S.C. § 1291 (1988) and 18 U.S.C. § 3742(a) (1988).
 
 II. Discussion
 
 9
 A. Motion to dismiss.
 
 
 10
 Appellants both contend that the district court judge erred in denying their motions to dismiss Counts Nine through Eleven for failure to state an offense. We accord indictment sufficiency questions de novo review. United States v. Soriano, 880 F.2d 192, 195 (9th Cir.1989).
 
 
 11
 Below, appellants argued that "no fraud could have been perpetrated" because the American Express insurance policy believed to be in question "contains no exclusion of benefit payments for the commission of a crime by the beneficiary." Thus, they maintained, Counts Nine through Eleven must be dismissed because the government had "failed to state how or why the acts outlined in [Counts Nine through Eleven] constitute wire fraud." E.g., Margo's ER at 14-15.
 
 
 12
 On appeal, Margo and Lemke have refined their argument. They suggest that because the indictment does not refer to California Probate Code § 252,[3] the necessary link connecting their murder-for-hire scheme and any wire fraud allegation is missing. The failure to mention § 252, they insist, renders Counts Nine through Eleven duplicative of Counts One through Eight, making them simply a rehash of the interstate facilities/murder-for-hire allegations.
 
 
 13
 Appellants' contention has some appeal. The indictment, while it alleges that Margo "would conceal her involvement in the murder from, among others, the insurance company," does omit any reference to § 252. The trial court, however, in denying the motion to dismiss, specifically found that "[i]n light of California Probate Code § 252, defendants' scheme to murder Mr. Thibault while concealing defendant [Margot]'s involvement constituted a scheme to defraud because, if successful, defendants would have defrauded Amex of insurance proceeds to which defendants were not legally entitled." The government first cited § 252 in its written response to the motion to dismiss.
 
 
 14
 Federal Rule of Criminal Procedure 7(c)(1) requires that an indictment "be a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P. 7(c)(1). The Rule also demands that the indictment "state for each count the official or customary citation of the statute, rule, regulation or other provision of law which the defendant is alleged therein to have violated." Id. Here, the indictment brought against Margo and Lemke cites to 18 U.S.C. § 1343 and generally alleges wire fraud.
 
 
 15
 Boiled down to its essence, appellants' argument on appeal is that reference to California Probate Code § 252 is an "essential fact" without which the indictment is deficient. That argument must fail. An indictment adequately alleges violation of 18 U.S.C. § 1343 if it asserts facts demonstrating "the formation of a scheme to defraud" and "a knowing use of the [wires] in furtherance of the scheme." United States v. Bernhardt, 840 F.2d 1441, 1446 (9th Cir.), cert. denied, 488 U.S. 954 (1988). The indictment at issue here satisfies the Bernhardt requirements; it alleges that appellants "devised ... a scheme to defraud" wherein certain individuals would be hired to kill Richard Thibault "so that defendant Margo J. Thibault could collect the proceeds from the life insurance policy insuring the life of her husband Richard Thibault." Three telephone conversations in furtherance of the scheme are alleged.
 
 
 16
 The indictment might have been more artfully crafted by including a reference to § 252,[4] but violation of § 252 is not an element of wire fraud. Moreover, "[a]n indictment should be read in its entirety, construed according to common sense and interpreted to include facts which are necessarily implied." United States v. Martin, 783 F.2d 1449, 1452 (9th Cir.1986). Here, the indictment described a murder-for-hire scheme in which Richard Thibault would be killed to enable Margo to collect on certain life insurance policies, and that in furtherance of this plan Margo "would conceal her involvement in the murder from, among others, the insurance company." California Probate Code § 252 is simply the codification of the commonsensical notion that murder to collect insurance proceeds is fraud.
 
 
 17
 Finally, it is always important to consider whether the "omission in an indictment worked to the prejudice of the accused. If it did not, a conviction will not be reversed merely because a minor or technical deficiency in the indictment is later discovered." United States v. Normandeau, 800 F.2d 953, 958 (9th Cir.1986). Margo and Lemke have no basis to claim that the government's failure to cite § 252 prejudiced them in defending themselves against the wire fraud counts. Thus, while we would not permit a trial judge to cure a truly deficient indictment, United States v. Keith, 605 F.2d 462, 464 (9th Cir.1979), clarification of a non-essential aspect of an indictment is not error. The trial court did not err in denying appellants' motion to dismiss Counts Nine through Eleven.
 
 
 18
 B. Cross-examination of government witness Lamb.
 
 
 19
 Appellants both claim that the trial judge improperly limited cross-examination of prosecution witness David "Jan" Lamb, and that those limitations violated their Sixth Amendment rights. We review a trial judge's decision to limit cross-examination for abuse of discretion. United States v. Bonanno, 852 F.2d 434, 439 (9th Cir.1988), cert. denied, 488 U.S. 1016 (1989). Whether cross-examination restrictions are so severe as to be violative of the Sixth Amendment's confrontation clause is a legal question that we review de novo. United States v. Vargas, 933 F.2d 701, 704 (9th Cir.1991).
 
 
 20
 Pursuant to the government's motion in limine, the trial court barred appellants' counsel from asking Lamb questions about six different topics. Three of those rulings are disputed on appeal. Appellants contend that the trial judge erred in disallowing questions pertaining to (1) Lamb's 1974 dishonorable discharge from the Army, (2) Lamb's 1972 Army enlistment application, and (3) Lamb's prior cooperation with law enforcement officials on another case.
 
 
 21
 We have made it clear that a trial judge does not abuse her discretion in limiting cross-examination " 'as long as the jury receives sufficient information to appraise the biases and motivations of the witness.' " United States v. Guthrie, 931 F.2d 564, 568 (9th Cir.1991) (quoting United States v. Feldman, 788 F.2d 544, 554 (9th Cir.1986), cert. denied, 479 U.S. 1067 (1987)). As the government correctly points out, the jury that convicted Margo and Lemke had "abundant impeachment evidence with which to assess Lamb's veracity." This material included the fact that Lamb was testifying under a grant of immunity, that he had prior felony convictions (plural), that he had violated his parole, that he had used drugs since the age of eleven (defense counsel queried Lamb about his memory in light of this long-term drug use), that he was a transsexual who dressed as a woman at the time of the murder-for-hire scheme, and that he had been a prostitute at one time.
 
 
 22
 The "quintessentially discretionary" task of "[m]aintaining the proper balance between the impeachment tactics of the prosecution and the defense" can only be undertaken by the trial judge. United States v. Jackson, 882 F.2d 1444, 1447 (9th Cir.1989). On the one hand, a defendant has broad cross-examination rights when the prosecution's case against her relies heavily on the credibility of a government witness. United States v. Ray, 731 F.2d 1361, 1364 (9th Cir.1984). Inquiry into specific instances of misconduct may be permitted if those instances are probative of truthfulness or untruthfulness. Fed.R.Evid. 608(b); Jackson, 882 F.2d at 1446.
 
 
 23
 The trial court granted defense counsel wide latitude in cross-examining Lamb. The judge was not required to permit "cumulative impeachment." Jackson, 882 F.2d at 1447. Moreover, there were good reasons for precluding cross-examination on each of the three disputed areas. Delving into Lamb's cooperation with police in a 1980 burglary case would likely have required testimony regarding Lamb's misdemeanor conviction in that case, which was inadmissible.[5] The trial judge's decision to preclude questioning that would have led into an impermissible area was neither an abuse of discretion nor error of constitutional magnitude. The trial court could perhaps have permitted cross-examination on other of the disputed issues, but there was no error in refusing to do so. See id. at 1446-47.
 
 
 24
 C. Cross-examination of Richard Thibault.
 
 
 25
 Margo and Lemke both claim that the district court judge improperly limited cross-examination of Richard Thibault, and further erred by refusing to admit into evidence a Garden Grove, California police department report. These mistakes, they maintain, violated their Sixth Amendment rights. As previously noted, we review limitation of cross-examination for abuse of discretion, United States v. Bonanno, 852 F.2d at 439, while we review the confrontation clause aspects of that question de novo. United States v. Vargas, 933 F.2d at 704. The trial court's refusal to admit evidence pursuant to Federal Rules of Evidence 402 and 403 is reviewed for abuse of discretion. United States v. Schaff, 948 F.2d 501, 505-06 (9th Cir.1991) (Rule 402); United States v. Kessi, 868 F.2d 1097, 1107 (9th Cir.1989) (Rule 403).
 
 
 26
 Garden Grove police investigator Pamela French was assigned in December 1987 to check out a reported burglary at Richard Thibault's office. Indeed, French called Margo during the course of that investigation, prompting Margo to stall David "Jan" Lamb and postpone another murder attempt. A second burglary at Thibault's office was reported on January 4, 1988. The investigator assigned to the second incident spoke with French some months later. In his report on the second break-in, he wrote that "[French] believes that Mr. Thibault ... is possibly embezzling money from the company." Appellants contend that this evidence was admissible, and that French's belief was a proper subject for cross-examination.
 
 
 27
 The district court judge correctly observed that the evidence submitted by the appellants regarding any wrongdoing by Richard was "simply a suspicion of this investigator." Such suspicions, without more, do not meet the requisite evidentiary threshold that would "show that the defendant's allegations of witness misconduct have some grounding in reality." Ray, 731 F.2d at 1364. Significantly, despite French's suspicions, Richard has not been charged with embezzlement.
 
 
 28
 Beyond the unsubstantiated nature of the embezzlement theory, the relevance of this line of inquiry is highly questionable. Appellants argue that Richard's alleged embezzlement is relevant to an understanding of Richard and Margo's marital relationship, but that connection is strained at best. The government rightly notes that appellants "utterly fail to explain how the allegation that Richard was embezzling from his business partner shows any bias toward [Margo] or any motive to testify falsely against her." Finally, the jury did hear evidence about Richard and Margo's stormy divorce proceedings, and Margo testified on direct examination that Richard was embezzling money from his business partner.
 
 
 29
 Thus, we find no error in the district court judge's decision to exclude evidence of, and cross-examination regarding, the suspicions of a police investigator that Richard Thibault was embezzling money. That evidence was irrelevant, or, at best, its relevance was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.
 
 
 30
 D. Prosecutor's closing argument.
 
 
 31
 Appellants contend that the prosecutor improperly personalized her closing argument. In discounting Margo's testimony that the murder scheme was Lamb's idea, and that she was simply playing along to keep tabs on Lamb, the prosecutor argued, "[t]hink about this, ladies and gentlemen, because it is completely at odds with Margo[ ]'s testimony from the witness stand. Would you tell a desperate madman who is supposedly threatening your mother and your family that you are coming to Denver[?]"
 
 
 32
 Appellants' contemporaneous objection to the prosecutor's argument was sustained. A subsequent motion for mistrial was denied by the trial judge. It is the denial of the mistrial motion to which appellants assign error, and we review this decision for abuse of discretion. United States v. Homick, 964 F.2d 899, 906 (9th Cir.1992). Because the trial judge "has broad discretion in the control of closing arguments," we will not reverse a judgment because of statements made during closing argument unless those statements "were so prejudicial that a failure to declare a mistrial was an abuse of discretion." People of Territory of Guam v. Ignacio, 852 F.2d 459, 462 (9th Cir.1988).[6] While the prosecutor's comments were improper, they were not close to being "so harmful that it is probable that they materially affected the fairness of the trial," id., and therefore the district court judge's denial of the mistrial motion did not constitute an abuse of discretion.
 
 
 33
 E. Sentencing Guidelines § 2E1.4.
 
 
 34
 Appellants claim that the district court judge incorrectly utilized U.S.S.G. § 2A2.1 in determining their sentences.[7] They argue that § 2E1.4 was the only Guidelines section that could be applied to a murder-for-hire scheme, that "only U.S.S.G. Section 2E1.4 [was appropriate], not Section 2E1.4 or 2A2.1." Application of the Sentencing Guidelines is reviewed de novo. United States v. Kohl, 972 F.2d 294, 297 (9th Cir.1992).
 
 
 35
 The government's suggestion that we should decline review of this question is appealing. The district court judge sentenced Margo to 126 months in prison, a penalty within Margo's total offense level (32) and criminal history category (I) range of 121-151 months. The trial judge sentenced Lemke to ninety months, a total appropriate to his 29/I range of 87-108 months. The government maintains that under appellants' sentencing theory, Margo would face a 31/I range of 108-135 months, and Lemke a 28/I range of 78-97 months. Because the sentences that the trial judge actually imposed fall within appellants' adjusted ranges, the argument goes, this court should decline to issue an advisory opinion. "In a situation where the trial judge would have pronounced the same sentence whether a dispute as to the appropriate guideline range was resolved in favor of the defendant or the government, a determination of which precise guideline range is applicable is unnecessary because the defendant cannot demonstrate prejudice." United States v. Turner, 881 F.2d 684, 688 (9th Cir.), cert. denied, 493 U.S. 871 (1989).
 
 
 36
 The only problem with the government's suggestion that we avoid this issue on appeal is the absence of evidence that the district court judge would have imposed the same sentences if each appellant's total offense level had been one level lower. See United States v. Skillman, 922 F.2d 1370, 1379 (9th Cir.1990) (discussing Turner, but remanding for resentencing because, inter alia, "it is unclear whether the district court would have given the same sentence"), cert. dismissed, 112 S.Ct. 353 (1991). In fact, in sentencing Lemke, the trial judge explicitly noted that she would "adhere to the guideline range of twenty-nine and a criminal history category of one."
 
 
 37
 We review because we must, but we affirm because Margo and Lemke's argument that § 2E1.4 is the only applicable Guidelines section is wrong. Appendix A to the Guidelines is the statutory index in which specific Guidelines sections are matched, or cross-referenced, to specific criminal statutes. In the first such appendix, dated October 1987, 18 U.S.C. § 1952A, the "murder-for-hire" statute,[8] is cross-referenced to Guidelines §§ 2A2.1 and 2E1.4, in that order. U.S.S.G.App. A, at A.21 (Oct. 1987). The same listing is found in the subsequent appendix, dated January 15, 1988. U.S.S.G.App. A, at A.15 (Jan. 15, 1988). The same listing is maintained in the next appendix, dated June 15, 1988. U.S.S.G.App. A, at A.16 (June 15, 1988).
 
 
 38
 These first three appendices all are prefaced with the instruction that "[i]f more than one guideline section is referenced for the particular statute, select the guideline most appropriate for the conduct of which the defendant was convicted." E.g., U.S.S.G.App. A, at A.1 (Oct. 1987). Thus, it might be argued that, at least on the face of the two sections, § 2E1.4 ("use of interstate commerce facilities in the commission of murder-for-hire") is more appropriately applied to appellants' conduct than § 2A2.1 ("assault with intent to commit murder; conspiracy or solicitation to commit murder; attempted murder"), but it cannot reasonably be disputed that both sections are listed in reference to 18 U.S.C. § 1952A.
 
 
 39
 Appellants ignore § 2E1.4's explicit language, which sets a base offense level of 23 or "the offense level applicable to the underlying unlawful conduct," whichever is "greater." U.S.S.G. § 2E1.4. The district court judge, using § 2A2.1, determined that the offense level applicable to the underlying unlawful conduct was 24. Because 24 was higher than 23, the trial court chose, pursuant to § 2E1.4, to apply § 2A2.1. In short, the trial judge properly applied both relevant Guidelines sections.
 
 
 40
 F. Issues germane only to Lemke.
 
 
 41
 1. Sufficiency of the evidence. Lemke asserts that there was insufficient evidence for any reasonable juror to find him guilty. Ordinarily, a sufficiency question is reviewed under the Jackson v. Virginia "any rational trier of fact" standard--that is, a conviction will be affirmed as supported by sufficient evidence if, " 'reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " United States v. Bishop, 959 F.2d 820, 829 (9th Cir.1992) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Where the defendant has not moved for a judgment of acquittal at the close of evidence, however, a more stringent "plain error" standard applies. United States v. Mora, 876 F.2d 76, 77 (9th Cir.1989). Lemke moved for a judgment of acquittal at the end of the government's case, but did not renew his motion at the close of evidence. Our review, accordingly, is to "prevent a manifest miscarriage of justice or for plain error." Id.
 
 
 42
 As described by his attorney, Lemke's story is essentially this. He is
 
 
 43
 a man who fell in love with a woman whose family and friends were beset with drug addiction, many had criminal pasts, they were financially destitute, and they exhibited propensities for violence which [Lemke] clearly distained [sic] and sought to avoid; unfortunately, he reluctantly exposed himself to these individuals, offering his friendship as an auto mechanic or chauffe[u]r, in order to maintain his relationship. As a result of his mere presence amongst Margo's troubled family and friends, he currently finds himself before this court seeking relief from unjust criminal convictions built upon a foundation of speculation.
 
 
 44
 Lemke's Brief at 7.
 
 
 45
 With respect to the 18 U.S.C. § 1958 charges (Counts Two and Four), Lemke argues that there was reasonable doubt that he was involved in a murder-for-hire scheme; it is plausible in many instances, he says, to construe his role as "nothing more than a chauffeur or auto mechanic who was employed through friendship, without any knowledge of criminal wrong-doing, to help out financially destitute family members or friends of Margo [Thibault-]Lemke." Id. at 19.
 
 
 46
 A conviction for violation of § 1958 requires proof that Lemke "traveled in interstate commerce with the intent that a contract murder be committed." United States v. Ransbottom, 914 F.2d 743, 746 (6th Cir.), cert. denied, 111 S.Ct. 439 (1990). The evidence is sufficient to show that Lemke's conviction on Counts Two and Four was not only not plain error, but that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
 
 
 47
 Lemke played an active role in shaping the scheme to kill Richard Thibault. He drove two of the hired killers from Colorado to California, and personally brought the intended murder weapon, a knife. He kept in close contact with Margo; telephone records produced by the government revealed many calls at key times. For example, after Margo learned that a Garden Grove police officer wanted to talk with her about the break-in at Richard's office, Lemke and Margo talked to each other on the phone ten different times that night, with the final conversation lasting approximately ninety minutes. Lamb testified that Lemke interviewed him to see if he was up to the task of killing Richard Thibault--Lemke identified various ways that Richard could be killed, and asked about Lamb's qualifications for undertaking the murder assignment.
 
 
 48
 Lemke also contests the evidentiary sufficiency of his wire fraud convictions (Counts Nine through Eleven). He maintains that there was a dearth of evidence that he intended to defraud any insurance companies or that he personally utilized any interstate communication devices to further the murder-for-hire/insurance fraud scheme. See Bernhardt, 840 F.2d at 1446 (setting forth elements of 18 U.S.C. § 1343 wire fraud).
 
 
 49
 Fraudulent intent need not be proved by direct evidence, but rather "can be inferred from statements and conduct." United States v. Cusino, 694 F.2d 185, 187 (9th Cir.1982), cert. denied, 461 U.S. 932 (1983). The jury heard evidence that Lemke was actively involved in the recruitment of the four killers, and that he knew Margo promised payment to them from Richard's life insurance policies. Lemke had no money, and, by the end of December 1987, neither did Margo. As the government summarizes, "[a] rational jury could have inferred that [Margo] and Lemke planned to defraud the insurance carriers by concealing from them the true circumstances of Richard's murder."
 
 
 50
 As to the significance of the fact that Lemke did not personally make the telephone calls set forth in Counts Nine through Eleven, case law is clear that a knowing participant in a fraudulent scheme is legally responsible for the improper use of the interstate wires by another scheme participant. See United States v. Dadanian, 818 F.2d 1443, 1446 (9th Cir.1987) (analyzing mail fraud), modified on other grounds, 856 F.2d 1391 (9th Cir.1988).[9] Thus, Lemke's criminal responsibility for telephone calls actually placed by Margo in furtherance of the wire fraud scheme stems from a conceptual framework analogous to conspiracy law. See United States v. Federbush, 625 F.2d 246, 253 (9th Cir.1980) (mail fraud). " 'So long as a transaction is within the general scope of a scheme on which all defendants had embarked, a defendant not directly connected with a particular fraudulent act is nonetheless responsible therefor if it was of the kind as to which all parties had agreed.' " Id. at 253-54 (quoting United States v. Amrep Corp., 560 F.2d 539, 545 (2d Cir.1977), cert. denied, 434 U.S. 1015 (1978)).
 
 
 51
 The government is correct that it need not establish Lemke's direct connection to the telephone calls set forth in Counts Nine through Eleven. No one disputes that the calls were made in furtherance of a scheme to defraud. Lemke's conviction on the wire fraud counts was not plain error.
 
 
 52
 Finally, Lemke disputes the sufficiency of evidence to sustain his 18 U.S.C. § 371 conspiracy conviction (Count Fourteen). His argument is two-fold. He objects to the admission of certain evidence, and to its sufficiency if admissible. He objects to the admission of testimony from government witnesses William McCoy and Anthony Miller, two of the hired killers, who testified that Lemke appeared to be listening to conversations that allegedly detailed the plot to kill Richard Thibault.[10] He contends that the evidence showed, at most, that he was merely present at the time of the alleged conspiratorial conversations, and that, as such, the McCoy and Miller testimony was unduly prejudicial and should have been excluded.
 
 
 53
 The district court did not abuse its discretion in admitting the McCoy and Miller testimony. Lemke apparently was listening at the meetings held to discuss the murder plot because his role was discussed and he undertook to perform that role as discussed. Miller, for example, testified that he met with Margo and Lemke prior to traveling to California. At that meeting, Margo explained to Miller that Lemke would drive Miller to California. Lemke did, in fact, do so, and supplied the intended murder weapon. Lemke drove Miller to the airport for a second attempt, and told Miller that Margo would meet him in California and give him a knife and some gloves. The testimony offered by McCoy and Miller, in short, was relevant and not unduly prejudicial. The district court judge's decision to admit it was not an abuse of discretion.
 
 
 54
 As to the sufficiency of the evidence, Lemke acknowledges that "[o]nce the government establishes that a conspiracy exists, evidence of only a slight connection to the conspiracy is necessary to convict a defendant of knowing participation in it." United States v. Taylor, 802 F.2d 1108, 1116 (9th Cir.1986), cert. denied, 479 U.S. 1094 (1987). The evidence discussed supra in reference to the § 1958 counts connects Lemke to the conspiracy to murder Richard Thibault in order to collect insurance proceeds.
 
 
 55
 2. Admission of the bankruptcy petition. Lemke contends that the trial judge erred in admitting government exhibit 70, Lemke's bankruptcy petition. As noted previously, we ordinarily review evidentiary decisions of this sort for abuse of discretion. Kessi, 868 F.2d at 1107. The government urges only plain error review in light of Lemke's failure to object at trial (there, only a relevance objection) upon the same basis argued on appeal (here, a Rule 403 objection). United States v. Gomez-Norena, 908 F.2d 497, 500 (9th Cir.), cert. denied, 111 S.Ct. 363 (1990).
 
 
 56
 Whatever the standard, evidence that Lemke was experiencing significant financial difficulty is probative of motive to commit a "money crime." Jackson, 882 F.2d at 1449 (permissible to admit testimony that defendant was "short on funds," having "financial difficulty," and "couldn't pay for things he needed to have done"); Feldman, 788 F.2d at 557 (permissible to introduce evidence through bank custodian that defendant's bank account overdrawn by more than $8,000); United States v. Reed, 639 F.2d 896, 907 (2d Cir.1981) ("defendant's belief that he is in financial difficulty is admissible to show motive, and not unduly prejudicial"; letter from bank, found in defendant's desk, advising defendant that he was eight months behind in his mortgage payments admissible).
 
 
 57
 Lemke argues that admission of the bankruptcy petition itself, however, is more prejudicial than permitting oral testimony of financial difficulty. See United States v. Reed, 700 F.2d 638, 642-43 (11th Cir.1983). The connection between a bankruptcy filing and motive to commit crime for financial gain may be illusory; "an individual enters bankruptcy for the purpose of having his debts discharged and thereby relieving the pressure which might compel him or her to commit a criminal act." Id. at 642. The admission of the petition in this case, however, does not seem unfairly prejudicial.
 
 
 58
 Here, the government presented evidence that, prior to filing his bankruptcy petition, Lemke was not able to pay his telephone and credit card bills, or for repairs on his truck. Margo covered him with about $2,000 worth of checks drawn on the joint checking account she held with Richard Thibault. By early January 1988, that account was overdrawn by some $13,000. On January 8, 1988, during the second of the monitored telephone calls between Margo and David "Jan" Lamb, Margo told Lamb that she was "running out of money" and couldn't afford to send him a plane ticket. We find no error.
 
 
 59
 3. Three-level enhancement for manager or supervisor role. Lemke contends that he did not deserve a three-level enhancement under U.S.S.G. § 3B1.1 for being a manager or supervisor in the murder-for-hire scheme. A trial judge's findings under § 3B1.1 are reviewed for clear error. United States v. Sanchez, 908 F.2d 1443, 1446 (9th Cir.1990).
 
 
 60
 Lemke reiterates the broad outlines of his story as support for his argument, claiming that he was merely Margo's boyfriend, that he "mistakenly" provided certain services at the wrong time to the wrong people, but that he was not involved in, "or for that matter even cognizant of, a high degree of planning, intent, and participation in a scheme to kill Richard Thibault."
 
 
 61
 In distinguishing leaders and organizers (who are given a four-level enhancement under § 3B1.1) from managers and supervisors, application note 3 advises the sentencing judge to consider
 
 
 62
 the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.
 
 
 63
 U.S.S.G. § 3B1.1, comment (n. 3) (Oct. 1987).
 
 
 64
 The district court gave this issue serious consideration. At Lemke's sentencing hearing, his attorney discussed the three-level enhancement at some length, as did the prosecutor. The district court determined that while Lemke was "[c]learly ... less culpable" than Margo,[11] it could not "in good conscience say that he does not have the role in the offense indicated in the tentative ruling."
 
 
 65
 Issued about a week prior to the sentencing hearing, the trial judge's tentative ruling on legal matters raised in the context of Lemke's sentencing sets forth her view of the evidence presented at trial:
 
 
 66
 [Lemke] contends that he rarely, if ever, participated in alleged conversations, and when present was always in the background. However, the evidence demonstrates otherwise. [Lemke] worked closely with [Margo] Thibault[-Lemke] to plan and organize the offense. He met with and helped recruit the would be killers. He was responsible for providing transportation to them. He suggested methods by which the intended victim could be killed. Moreover, [Lemke] was not a hired killer: as a result of his intimate relationship with [Margo] he stood to share equally in the profit with her if the crime was successfully completed. Under these circumstances, a three level enhancement for defendant's role in the offense is appropriate.
 
 
 67
 Given the obvious attention the district court judge accorded this issue, and the fact that her application of the facts to the Guidelines provisions would not seem to be clearly erroneous, we uphold Lemke's three-level enhancement under U.S.S.G. § 3B1.1.
 
 III. Conclusion
 
 68
 Appellants' arguments on appeal are rejected, and their convictions and sentences are AFFIRMED.
 
 
 
 *
 Because of a calendaring mix-up, appellant Margo Thibault-Lemke's attorney was not present at oral argument. The panel entered a written order that a copy of the transcript of the government's argument be provided to counsel, and that counsel be permitted 10 days to respond. Counsel subsequently notified the court that he would have no response, "submit[ting] the matter on briefs previously filed." Appellant William Lemke's motion for submission on the briefs and record, without oral argument, was granted by the panel on September 30, 1992
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 Margo married Lemke on September 1, 1990, about seven months prior to their indictment in this case. For clarity, she will be referred to in this memorandum by her first name
 
 
 [2]
 Garden Grove, California police officers wanted to talk with Margo at that time about a break-in at Richard's office. Margo figured that Richard's death at that juncture would create problems for her--"[y]ou know," she tells Lamb on tape, "I'd be the first one they'd look at."
 
 
 [3]
 In relevant part, § 252 provides that "[a] named beneficiary of a bond, life insurance policy, or other contractual arrangement who feloniously and intentionally kills the principal obligee or the person upon whose life the policy is issued is not entitled to any benefit under the bond, policy, or other contractual arrangement." Cal.Prob.Code § 252 (West 1991)
 
 
 [4]
 Alternatively, the government might have brought a superseding indictment explicitly citing § 252
 
 
 [5]
 Also, the application, discharge, and cooperation occurred some time ago. "[R]emoteness remains a relevant factor for the trial court to consider in assessing the probative value of the evidence," though that factor does not by itself "require" exclusion of the evidence. Jackson, 882 F.2d at 1448
 
 
 [6]
 To the extent that appellants might contend that their argument here includes a prosecutorial misconduct prong distinct from their primary mistrial focus, that contention is unavailing. We review prosecutorial comments to which a defendant objects for harmless error. United States v. Endicott, 803 F.2d 506, 513 (9th Cir.1986). We attempt to discern "whether allegedly improper behavior, considered in the context of the entire trial ..., affected the jury's ability to judge the evidence fairly." Id. Here, the prosecutor's comment was an isolated reference during an hour-long closing argument; the trial court sustained appellants' objection to the arguably personalized "your mother and your family" language; the prosecutor immediately rephrased her thought; and, finally, neither appellant asked the trial judge to give a curative instruction, although the prosecutor herself suggested that particular cure
 
 
 [7]
 The trial court applied the 1987 version of the Guidelines because the government urged her to do so and because the "offense levels set forth have become more onerous as subsequently amended." The judge recognized that the general statutory requirements mandate application of the Guidelines that are in effect on the date of sentencing. See 18 U.S.C. § 3553(a)(4); see also United States v. Monroe, 943 F.2d 1007, 1018 n. 13 (9th Cir.1991), cert. denied, 112 S.Ct. 1585 (1992)
 
 
 [8]
 18 U.S.C. § 1952A was renumbered 18 U.S.C. § 1958 in November 1988. The indictment here cites to § 1958, probably because it was filed in 1991. The conduct for which Margo and Lemke were convicted ended on or about January 11, 1988, prior to the renumbering
 
 
 [9]
 The scope of the wire fraud statute, 18 U.S.C. § 1343, is "equally broad" as the scope of the mail fraud statute, 18 U.S.C. § 1341. United States v. Calvert, 523 F.2d 895, 903 (8th Cir.1975), cert. denied, 424 U.S. 911 (1976). So long as it can be shown that one defendant "caused" the interstate wire communications, it does not matter that he did not himself make the (for example) phone calls. Id.; see also United States v. Johnson, 700 F.2d 163, 177 (5th Cir.1983) ("not necessary to find that [defendant] placed the calls himself in order to find that he 'caused them to be placed' "), rev'd, in nonrelevant part, 718 F.2d 1317 (5th Cir.1983) (en banc); United States v. Muni, 668 F.2d 87, 89 (2d Cir.1981) (similar analysis); United States v. Benmuhar, 658 F.2d 14, 16-17 (1st Cir.1981) ("that [defendant] did not personally ... telephone any communications makes no difference in this situation"), cert. denied, 457 U.S. 1117 (1982)
 Calvert, Johnson, Benmuhar, and Muni all cite to Pereira v. United States, 347 U.S. 1 (1954), for the relevant "caused" standard: "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." Pereira, 347 U.S. at 8-9.
 
 
 [10]
 Our review of the evidentiary decision to permit McCoy's and Miller's testimony is under the abuse of discretion standard. Kessi, 868 F.2d at 1107
 
 
 [11]
 Lesser culpability does not in and of itself mean that Lemke could not have been a manager or supervisor, as contemplated by the Sentencing Guidelines. Application note 3 counsels that "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1, comment (n. 3) (Oct. 1987). If there can be more than one leader or organizer, there would seem to be no reason why (at least in theory) there could not be a leader/organizer (here, Margo, who indeed received a four-level leader/organizer enhancement) and a manager/supervisor (here, Lemke)