UNITED STATES of America, Appellee,

v.

George Junious LEAKE, Appellant.

UNITED STATES of America, Appellee,

v.

Robert FAULKNER, Appellant.

Nos. 80–5027, 80–5028.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 11, 1980.

Decided Feb. 24, 1981.

Rehearing Denied June 26, 1981.

James E. Ferguson, II, Charlotte, N. C. (C. Yvonne Mims, Chambers, Stein, Ferguson & Becton, P. A., Charlotte, N. C., on brief) and Michael S. Scofield, Charlotte, N. C., for appellants.

Wayne C. Alexander and Harold J. Bender, Asst. U. S. Attys., Charlotte, N. C. (Harold M. Edwards, U. S. Atty., Charlotte, N. C., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, WINTER, Circuit Judge, and INGRAHAM, Senior Circuit Judge.*

WINTER, Circuit Judge:

George J. Leake was convicted of one count of conspiracy to misappropriate federal funds and eight counts of misappropriation of federal funds, and Robert Faulkner was convicted of one count of conspiracy to misappropriate federal funds and ten counts of misappropriation of federal funds in violation of 18 U.S.C. §§ 371 and 641.[1] They appeal, contending that their trial was flawed by numerous procedural and constitutional errors. Because we think that the district court made two erroneous prejudicial evidentiary rulings, we reverse the judgment of the district court and grant the defendants a new trial.

I.

In 1974, after having received a three-year grant of federal funds from the National Institute for Alcohol Abuse and Alcoholism ("NIAAA"), an agency of the United States Government, defendants Leake and Faulkner formed a corporation called Innovative and Concentrated Approaches to Combating Drug Use, Inc., ("Innovative"). Leake served as the corporation's Executive Director, and Faulkner as Assistant Executive Director. Operating at two locations in Charlotte, North Carolina, Innovative's stated purpose was to provide counseling and rehabilitation to black alcoholics.

---

* Honorable Joe McDonald Ingraham, United States Circuit Judge for the Fifth Circuit.

1. Alton C. Hunnicutt and Debra Day were also codefendants. Ms. Day's motion for acquittal at the close of the government's case was granted, and the jury acquitted Hunnicutt of all charges. Thus, they are not involved in this appeal.

Leake and Faulkner were charged in the indictment filed against them in 1979 with having falsely represented to NIAAA that four persons were employed by Innovative, that two others were hired by Innovative to serve as consultants, and that two firms and two persons had provided goods to or performed services for Innovative. The indictment alleged that the NIAAA funds provided to Innovative to pay these persons and firms went instead to Leake and Faulkner. The NIAAA funds were deposited in one of several Innovative bank accounts, and the checks drawn by Innovative on those accounts ostensibly to pay its employees and consultants were allegedly cashed by Faulkner and the proceeds taken by him and Leake.

At the trial, the prosecution called several of the persons alleged in the indictment to have been fictitious employees or consultants. Of the evidence provided by these persons that supported the charges against Leake and Faulkner, clearly the most damaging was the testimony of Thomas Johnson. Johnson testified that although he had never been employed by Innovative, he received a federal income tax withholding form for 1975 stating that he had been paid over $7,000 by Innovative that year. When he asked Leake and Faulkner why he had received the form, they told him "they would help [him] work it out." Sometime later, Leake and Faulkner asked Johnson to sign certain "papers" to show that he had been an Innovative employee in 1975. The government introduced these "papers" as exhibits, and Johnson identified them. They included one document that purported to be an application for employment with Innovative, and another that was ostensibly Johnson's employment contract with the corporation. Johnson said that he signed these documents without knowing what they were.

On cross-examination, defense counsel sought to discredit Johnson by showing that he had been involved in numerous fraudulent financial schemes. The district court permitted defense counsel to elicit responses from Johnson showing that he had been indicted for bank fraud, that he had testified for the government in a criminal bank fraud case, that he had knowledge of his church's having arranged loans for eighteen persons in Pennsylvania in 1974, and that he had "aided his pastor" in obtaining those loans. However, the district court sustained the prosecution's objection to defense counsel's query of Johnson concerning his procurement of a loan from a Pennsylvania bank and, after his failure to repay the loan, the entering of a default judgment against him. Out of the jury's presence, defense counsel argued that this question and other similar ones were proper because through them he was attempting to show a "pattern of fraudulent activity" on Johnson's part to demonstrate his motive for testifying against defendants, that of incriminating them to save himself.

The district court ruled that defense counsel could not ask further questions of Johnson regarding "prior conduct not resulting in convictions or arrests." To establish a record for appeal, the district court permitted defense counsel to question Johnson outside of the jury's presence about numerous loans he had received and not repaid, his falsification of a loan application, several worthless checks he had drawn, several default judgments that had been entered against him, and an outstanding bill of indictment against him for obtaining money under false pretenses. Defense counsel also placed in the record three exhibits, which were not shown to the jury: two Federal Bureau of Investigation reports stating that in 1975 and 1976 Johnson had admitted to conspiring to falsify loan applications, and a typed, five-page summary of the various matters about which defense counsel sought to question Johnson on cross-examination.

Defendant Leake testified, denying all of the charges against him. He said that all of the persons claimed to be employees and consultants of Innovative were in fact so, and he denied ever diverting NIAAA funds sent to Innovative to pay those persons. Leake attempted to refute count four of the indictment in which he was charged with aiding and abetting Faulkner in misappro-

priating $6,825 in federal funds by paying that amount to Dr. Eugene Alexander for services he did not perform and then having Dr. Alexander return the money to the defendants. Leake testified that Dr. Alexander received several checks from Innovative in return for his providing medical services to Innovative's clients. He was precluded from explaining the circumstances under which Dr. Alexander returned the money to Innovative because the district court sustained the government's objection on hearsay grounds to Leake's recounting of a conversation he had with H. O. Graham, Chairman of the Board of Innovative. Outside the presence of the jury, defense counsel stated that Leake would testify that Graham told him that Graham had authorized the spending of the money Dr. Alexander returned to finance a country music concert to be held to raise funds for Innovative.

## II.

The defendants challenge the validity of their convictions on numerous grounds. They argue that the district court erred in two evidentiary rulings: first, by refusing to permit defense counsel to question fully Thomas Johnson on cross-examination concerning various fraudulent financial schemes in which he had engaged; and second, by characterizing as inadmissible hearsay, Leake's recounting of what Graham had told him regarding the money Dr. Alexander returned to Innovative. They also contend that their rights to a fair trial were denied by the prosecution's use of its peremptory challenges to excuse four black persons called as potential jurors, by its failure to inform defense counsel that a government witness would testify at trial inconsistently with earlier statements he had made, and its characterization of an unavailable witness, who was wanted for parole violations, as a prison "escapee." Finally, the defendants argue that the district court abused its discretion by denying their motions to sever their cases for separate trials, by requiring them to exercise their peremptory challenges jointly, by refusing to grant them additional peremptory challenges, and by requiring them to state their objections to jury instructions at the bench while the jury was in the courtroom. We find merit in the defendants' arguments on the evidentiary rulings, and as a consequence we reverse their convictions and award them new trials. Because defendants' other contentions are either lacking in merit or unlikely to arise on retrial, we see no need to address them.

A. The Cross-examination of Thomas Johnson.

Federal Rule of Evidence 608(b), which prescribes the manner of cross-examining a witness by showing his "prior bad acts," provides in part:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

The rule recognizes that the trial court must have discretion to apply the overriding safeguards of rule 403 (excluding evidence if its probative value is substantially outweighed by dangers of prejudice, confusion or delay) and rule 611 (barring harassment and undue embarrassment of a witness). The trial court's discretion is not, however, absolute; it may not foreclose a legitimate inquiry into a witness's credibility. *See United States v. Banks*, 520 F.2d 627, 630–31 (7 Cir. 1975). Rule 608 authorizes inquiry only into instances of misconduct that are "clearly probative of truthfulness or untruthfulness," such as perjury, fraud, swindling, forgery, bribery, and embezzlement. *See* 3A *Wigmore on Evidence* § 982 (Chadbourn rev. 1970); *McCormick on Evidence* § 42 (2d ed. 1972).

We recognize the broad discretion rule 608(b) grants to district courts in determining what matters may be raised on cross-examination. We hold, however, that the district court in this case erred in exercising that discretion because it mistakenly relied on *United States v. Walton*, 602 F.2d 1176 (4 Cir. 1979), in ruling that defense counsel could not question Johnson about many of the fraudulent activities in which he had been involved. In *Walton*, we decided only that rule 608(b) proscribes the use of *extrinsic evidence* in cross-examining a witness concerning "prior bad acts." *See* 602 F.2d at 1180. *Walton* does not therefore address the proper scope of cross-examination under rule 608(b), and is irrelevant to a case—such as this one—not involving the attempted use of extrinsic evidence of past conduct. By relying on *Walton*, the district court failed to consider the proper factors to be employed in measuring the scope of cross-examination: the importance of the testimony to the government's case, the relevance of the conduct to the witness's truthfulness, and the danger of prejudice, confusion, or delay raised by evidence sought to be adduced. *See McCormick on Evidence* § 42 (2d ed. 1972); Fed.R. Evid. 403 and 611.

The district court's limitation of defense counsel's cross-examination of Johnson was clearly prejudicial error. The conduct of Johnson that defense counsel sought to expose was probative of Johnson's truthfulness. The questions defense counsel asked Johnson outside of the jury's presence and the document defense counsel placed in the record listing the matters he sought to inquire about indicate that Johnson had been indicted in New Jersey for "obtaining money under false pretenses," a warrant for his arrest for "defrauding an innkeeper" had been issued in North Carolina, six checks drawn by him had been returned for insufficient funds, numerous default judgments had been entered against him in civil actions seeking repayment of loans, and he, or firms that he controlled, had entered numerous contracts to build churches, received payment, but failed to complete the work due under those contracts.[2] These matters certainly establish a pattern of fraudulent activity that, if revealed, would have placed Johnson's credibility in question.[3]

As we have shown, Johnson's testimony was crucial to the prosecution's case. Johnson was the only witness who testified that the defendants had falsely claimed him to be an employee of Innovative. He also said that Leake and Faulkner had asked him to sign false documents that they could use to prove that he had worked for Innovative. Had Johnson been questioned about his various fraudulent activities before the jury, it might have disbelieved Johnson's testimony, and the defendants found not guilty. There is no question, then, that the district court's error was prejudicial and not harmless. *See United States v. Nyman,* 649 F.2d 208 (4 Cir., 1980) (test of harmlessness for nonconstitutional error is whether it is probable that the error could have affected the verdict reached by the particular jury in the particular circumstances of the trial at issue).

## B. Leake's Testimony Regarding His Conversation with Graham.

Count four of the indictment charged Leake with aiding and abetting Faulkner in misappropriating $6,825 in federal funds by paying that amount to Dr. Alexander for services that he did not perform, and having Dr. Alexander return that money to the defendants. To show that Leake did not have the specific intent to aid and abet this

---

2. We do not, of course, hold that the documentary evidence proffered by defense counsel was admissible. Indeed, rule 608 specifically renders it inadmissible. However, counsel could have used the documents as an aid in phrasing questions to Johnson about specific instances of his conduct affecting his credibility.

3. In the district court the prosecution did not question defense counsel's basis for raising these matters, nor does it do so before us. We assume, therefore, that defense counsel had a reasonable basis for believing that Johnson actually committed the acts about which he was sought to be questioned.

illegal diversion,[4] defense counsel sought to have Leake testify that, based on a conversation he had with H. O. Graham, then Chairman of Innovative's Board, he understood that the money returned by Dr. Alexander had been used to finance a country music concert to be held to raise money for Innovative. Leake's testimony was proffered as follows:

Q. Bishop Leake, what conversation did you have with Reverend Graham regarding the money which had been returned by Dr. Alexander?

A. Reverend Graham informed me in a conversation that he had instructed Mr. Faulkner, after conversing with Mr. Johnson, to turn those funds over to Mr. Johnson for the purpose of—the explicit purpose of bringing a Charlie Pride country music show to this community to generate funds for Innovative.

Q. What did you say to Reverend Graham in response to it?

A. I said to him that I thought that he had exceeded his authority in that matter in that no one had conferred with me. First of all, that the funds had been returned since I was out of the city and no one had conferred with me about what they were going to do with them, and he exerted his authority as Chairman of the Board.

The district court sustained the prosecution's objection to this testimony, ruling that it was inadmissible as hearsay, not within any of the recognized exceptions to the hearsay rule.

■ We hold that the district court erred in excluding this portion of Leake's testimony. Although the testimony recounted the out-of-court statement of another, it was not hearsay because the statement was not offered to prove the truth of the matter asserted.[5] Graham's statement to Leake concerning the returned funds was not offered to prove that the money was, in fact, used to finance a country music concert; its purpose rather was to show that Leake believed that the funds were being used in a legitimate fashion. The statement thus served as circumstantial evidence of Leake's state of mind, and would have been evidence that he did not have the specific intent necessary to aid and abet an illegal payment to Dr. Alexander.[6] *See United States v. Carter*, 491 F.2d 625 (5 Cir. 1974) (defendant's proposed testimony that his cousin lent him an automobile and had not told him it was stolen was not hearsay, but admissible to prove defendant's state of mind in prosecution for receiving a stolen automobile, a crime requiring proof of knowledge that the automobile was stolen). Had Leake been permitted to recount what Graham had told him, the jury might have found that Leake lacked the criminal intent necessary to convict him of aiding and abetting the misappropriation of the returned money. The district court's error in exclud-

---

4. To sustain an aiding and abetting conviction, the prosecution must show not only that the defendant participated in a criminal venture, but that he intentionally furthered the venture's illegal purpose. *United States v. Groomer*, 596 F.2d 356 (9 Cir. 1979).

5. Fed.R.Evid. 801(c) defines a hearsay statement as one, "other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *See generally* 6 *Wigmore on Evidence* § 1766 (Chadbourn rev. 1976); *McCormick on Evidence* § 246 (2d ed. 1972).

6. Because Graham's statement to Leake was not offered to prove that the money Dr. Alexander returned was used to finance the benefit concert, it was not hearsay. Even if the district court interpreted the statement as constituting hearsay, however, it erred in finding that

Leake's testimony was not admissible under the "state of mind" exception to the hearsay rule. Fed.R.Evid. 803(3) provides that the hearsay rule will not exclude a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed...." Leake was therefore competent to testify to what went on in his mind. Leake's testimony regarding his conversation with Graham would be meaningless unless both sides of the conversation were recounted to the jury. Graham's statements to Leake were admissible, therefore, as necessary to explain the context in which Leake made the statements revealing his state of mind.

ing the testimony was, therefore, prejudicial.[7]

We reverse the judgment of the district court and grant the defendants a new trial.

REVERSED; NEW TRIAL GRANTED.

---

7. Because the district court's error on the exclusion of testimony as hearsay relates only to that portion of count four of the indictment charging Leake with aiding and abetting, and because the other erroneous evidentiary ruling in the case—the restriction of the cross-examination of Thomas Johnson—involves the validity of the convictions of both defendants on all counts of the indictment, resolution of the latter issue ordinarily would render consideration of the hearsay objection unnecessary. We have considered the hearsay error, however, because of the likelihood that the issue will arise again if the government elects to retry the defendants. *See United States v. Carter*, 491 F.2d 625, 630 (5 Cir. 1974).