UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

RAYMOND TAYLOR,
                    *Plaintiff-Appellant,*

                    v.

ANTHONY MOLESKY, individually and
in his official capacity; FRANK
MADDEN, JR., individually and in his
official capacity; MICHAEL MOREY,
individually and in his official
capacity; KENNETH HYMAN,                        No. 02-1801
individually and in his official
capacity; DAVID MILLER, individually
and in his official capacity; MARTY
FRIEDENGER, individually and in his
official capacity; THE BALTIMORE
CITY POLICE DEPARTMENT; MAYOR
AND CITY COUNCIL OF BALTIMORE;
STATE OF MARYLAND,
                    *Defendants-Appellees.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(CA-98-1155-Y)

Argued: April 3, 2003

Decided: May 14, 2003

Before WILKINSON and SHEDD, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Affirmed by unpublished per curiam opinion.

---

**COUNSEL**

**ARGUED:** James Kevin MacAlister, SAIONTZ, KIRK & MILES, P.A., Baltimore, Maryland, for Appellant. Donald Ray Huskey, Chief of Staff, William Rowe Phelan, Jr., Principal Counsel, BALTIMORE CITY DEPARTMENT OF LAW, Baltimore, Maryland, for Appellees. **ON BRIEF:** Thurman W. Zollicoffer, Jr., City Solicitor, Kurt Heinrich, Assistant Solicitor, BALTIMORE CITY DEPARTMENT OF LAW, Baltimore, Maryland, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

Raymond Taylor brought this lawsuit under 42 U.S.C. § 1983 and Maryland law, asserting several claims arising from his arrest and detention in a Baltimore jail. The district court entered judgment on the jury's verdict in favor of the defendants — six Baltimore City police officers, the Baltimore police department, City officials, and the State of Maryland. Taylor argues on appeal that his trial was tainted by improper jury selection and evidentiary rulings. We find no reversible error, and we affirm.

I.

At about 5:00 on the morning of March 6, 1995, the defendant police officers responded to a call for a breaking and entering in progress at the home of Colette Chambers, Taylor's former girlfriend. Taylor was standing on the front steps when the officers arrived at the scene. One officer stayed outside with Taylor, while two others went

inside the house to speak with Chambers. After speaking with Chambers and her friend Renee Brown, the officers arrested Taylor. According to one officer's testimony, this was a "domestic situation," not a burglary. Taylor denied Chambers's allegations of domestic violence and charged the defendants with false arrest and malicious prosecution.

Taylor also complained that the police officers placed him in leg irons, injured his foot, hit him in the back and side, kicked him, and ordered him to crawl to a cell at the back of the jail. Taylor further alleged that another officer made him remove all his clothes before he could get to his cell. These allegations gave rise to Taylor's claims for use of excessive force, denial of medical care, and unlawful deprivation of clothing in violation of Maryland state law and his federal constitutional rights.

The district court dismissed the entire suit against the police department and dismissed the § 1983 claim against the State. The court then bifurcated the remaining claims, reserving proceedings against the City officials and the State until judgment was entered on Taylor's claims against the individual defendants.

The case against the individual defendants was tried to a jury for three days in May 2002. At the close of Taylor's case, the district court granted the defendants' motion for judgment as a matter of law with respect to the false arrest and malicious prosecution claims. Thus, the only claims that went to the jury were claims for use of excessive force and deprivation of clothing — claims relating solely to events that occurred after Taylor's arrest. The jury returned a verdict for the defendants. The district court then entered judgment for the individual defendants, the City officials, and the State. Taylor moved for a new trial pursuant to Fed. R. Civ. P. 59. The district court denied the motion, and this appeal followed.

## II.

We review a district court's denial of a motion for new trial for abuse of discretion. *Bristol Steel & Iron Works, Inc. v. Bethlehem Steel Corp.*, 41 F.3d 182, 186 (4th Cir. 1994). "In reviewing a grant or denial of a new trial, the crucial inquiry is whether an error

occurred in the conduct of the trial that was so grievous as to have rendered the trial unfair." *Id.* (internal quotations omitted).

Taylor argues that the jury's verdict should be set aside for three reasons. First, he claims that defense counsel excluded one prospective juror as a result of purposeful racial discrimination in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). Second, he argues that the district court improperly admitted into evidence court documents pertaining to the ongoing domestic dispute between Taylor and Chambers. Finally, Taylor challenges defense counsel's reading to the jury a charging statement pertaining to an earlier arrest arising from a domestic dispute between Taylor and Chambers.

A.

The United States Supreme Court held in *Batson* that "[a]lthough the prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his view concerning the outcome of the case to be tried, the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." *Id.* at 89. This non-discrimination rule applies in civil cases as well as criminal cases. *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 618-30 (1991). Thus, "a private litigant in a civil case may not use peremptory challenges to exclude jurors on account of race." *Davis v. Baltimore Gas & Elec. Co.*, 160 F.3d 1023, 1026 (4th Cir. 1998).

*Batson* prescribes a three-step analysis for proving racial discrimination in jury selection. First, the party attacking the use of a peremptory challenge must make a *prima facie* showing that the opposing party employed the peremptory challenge on the basis of race. *Batson*, 476 U.S. at 96-97. Once a *prima facie* case is established, the burden shifts to the opposing party to provide a racially neutral explanation for the use of the peremptory challenge. *Id.* at 97-98. Finally, once a neutral justification is offered, the trial court must "determine if the [party attacking the peremptory challenge] has established purposeful discrimination." *Id.* at 98. The party attacking a peremptory challenge always bears the burden to prove purposeful discrimination. *Id.* at 93. *Accord Howard v. Moore*, 131 F.3d 399, 407 (4th Cir. 1997) (*en banc*).

Ordinarily, the party attacking the use of a peremptory challenge must make a *prima facie* case of discrimination "by showing that (1) opposing counsel has exercised peremptory strikes to remove members of a cognizable racial group from the venire; and (2) the facts and any other relevant circumstances raise an inference that counsel used the strikes to exclude the venire persons from the jury on account of their race." *Davis*, 160 F.3d at 1026-27. At the close of *voir dire*, Taylor's counsel made his *Batson* challenge, noting that defense counsel had used a peremptory challenge to remove Juror 91, an African-American male who was a resident of the City of Baltimore.

In response to this objection, defense counsel stated that he exercised his peremptory challenge against Juror 91 because of that juror's residency in the City of Baltimore, his occupation, and his demeanor.[1] Defense counsel's proffered explanation for the peremptory challenge was not required to be "persuasive, or even plausible, as long as it [was] [racially] neutral." *Howard*, 131 F.3d at 407. Defense counsel's explanations were racially neutral, and they satisfied the defendants' burden under *Batson*.

Thus, it was left for the district court to determine whether defense counsel's use of a peremptory challenge to remove Juror 91 amounted to purposeful discrimination. Purposeful discrimination may be shown by demonstrating that the racially neutral explanation offered by the opposing party was merely pretextual. *Davis*, 160 F.3d at 1026. In the end, a finding of purposeful discrimination "turn[s] principally on credibility determinations." *Evans v. Smith*, 220 F.3d 306, 313 (4th Cir. 2000). "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the

---

[1]Since defense counsel answered the *Batson* challenge by offering an explanation for his use of the peremptory challenge, we will assume that Taylor satisfied his initial burden and made a *prima facie* case of discrimination. *See Davis*, 160 F.3d at 1027. We doubt, however, that the bare objection made in this case would itself suffice to require explanation from the party exercising the peremptory challenge.

state of mind of a juror, evaluation of the [striking lawyer's] state of mind based on demeanor and credibility lies peculiarly within a trial judge's province." *Id.* (internal quotations omitted).

The district court concluded that the peremptory challenge used against Juror 91 was permissible because (1) defense counsel had a good-faith belief that it was advantageous to strike City of Baltimore residents who might be hostile to police officers and (2) defense counsel was uncomfortable with the demeanor of Juror 91. "A finding by the district court concerning whether a peremptory challenge was exercised for a racially discriminatory reason is given great deference and is thus reviewed only for clear error." *United States v. Blanding*, 250 F.3d 858, 860 (4th Cir. 2001) (internal quotations omitted).

Taylor challenges the district court's approval of the Baltimore-resident explanation because a white woman from Baltimore actually sat on Taylor's jury. During the hearing on the *Batson* challenge, Taylor's counsel asserted that defense counsel had not challenged other Baltimore residents. Defense counsel responded by stating that he "struck the Baltimore City school teacher. And I think he [Taylor's counsel] struck the same person." Taylor's counsel never offered the juror list to the district court or otherwise refuted defense counsel's recollection on this point, even though Taylor bore the burden to prove purposeful discrimination. Thus, the district court was left with an uncontradicted representation that defense counsel had consistently employed peremptory challenges to remove Baltimore residents from the panel. On this record, we cannot say that the district court clearly erred in accepting defense counsel's explanation and denying Taylor's *Batson* challenge.

We also find no error in the district court's decision to accept defense counsel's assertion that he was uncomfortable with Juror 91's demeanor during his individual *voir dire*. We have recognized that "[n]umerous factors may influence the decision [to exercise a peremptory challenge] . . . including present and past employment, *general appearance and demeanor*, previous jury service, and the absence or presence of apparent prejudice." *United States v. Lane*, 866 F.2d 103, 106 (4th Cir. 1989) (emphasis added). Again, while counsel may not challenge a prospective juror on account of race, counsel may remove a prospective juror "for any reason at all, as long as that reason is

related to [counsel's] view concerning the outcome of the case to be tried." *Batson*, 476 U.S. at 89. Defense counsel did not say what it was about Juror 91 that made him uncomfortable. Nor did the district court make any findings on that specific issue, except to state that it could "understand why [defense counsel] felt that he may not be comfortable with the juror." The district court was well positioned to assess both Juror 91's demeanor in court and defense counsel's credibility with respect to his explanation for removing Juror 91. The district court's acceptance of defense counsel's neutral explanation is not clearly erroneous and thus should not be disturbed. *See Blanding*, 250 F.3d at 860.

## B.

Taylor next challenges the district court's admission into evidence of three records from a state court proceeding initiated by Chambers two days after Taylor's arrest and involving allegations that Taylor was abusing Chambers. We review the district court's rulings on these evidentiary issues for abuse of discretion, and we will find an abuse of discretion only where the district court's rulings were arbitrary and irrational. *United States v. Achiekwelu*, 112 F.3d 747, 753 (4th Cir. 1997).

## 1.

The district court admitted into evidence, with a limiting instruction, the Petition for Protection from Domestic Violence that Chambers filed in Maryland state court two days after the police arrested Taylor. The petition, which was signed under oath, sought protection for Chambers and her three children.[2] Chambers alleged in the petition that Taylor had shoved her, threatened her with violence, and threatened to kick in the door of Chambers's house. Taylor argues that the petition was inadmissible hearsay.

Evidence is hearsay if it is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c).

---

[2]Taylor was the father of one of Chambers's children.

A statement is not hearsay if it is offered to show merely that the statement was made, and not to show that its contents are true. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 173 n.18 (1988); *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001).

The district court correctly ruled that the petition was not hearsay because it was not introduced to prove the matter asserted — that Taylor had, in fact, abused Chambers. Rather, the petition was offered only to show that Chambers had made such allegations, a fact that was highly relevant to Taylor's false arrest claim and the defendants' assertion that Chambers made similar allegations to them before they arrested Taylor. The district court did not abuse its discretion in admitting this evidence with a limiting instruction.[3]

2.

The district court also admitted into evidence copies of an *Ex parte* Order and a Protective Order entered by the state court. The *Ex parte* Order states that "there are reasonable grounds to believe" that Taylor had kicked in Chambers's door several times, picked her up and tried to throw her down stairs, and otherwise harassed her. The Protective Order, entered two weeks later, notes that a hearing was held on the petition for protection at which both Chambers and Taylor appeared. The order then states that "there is clear and convincing evidence" that Taylor shoved, threatened, and harassed Chambers and kicked in her door several times. According to the document, Taylor consented to entry of the Protective Order.

Taylor argues that these orders should not have been admitted into evidence because the findings of fact contained therein were inadmissible hearsay. The defendants argue at the outset that Taylor's consent to entry of the Protective Order renders the findings contained in the

---

[3]The district court instructed the jury that the Petition for Protection was admitted "because it is relevant to the question of what Ms. Chambers told the officers on the day in question. And that is what is the relevant fact here, is what the officers knew. One of the issues in this case is whether they had probable cause for the arrest of Mr. Taylor. And they did it based upon what Ms. Chambers told them."

order party admissions and thus not hearsay. *See* Fed. R. Evid. 801(d)(2)(B). As the district court instructed the jury, however, "it's not clear from the face of the form whether or not Mr. Taylor consented" to the specific findings contained in the protective order. Accordingly, the party-admission doctrine does not justify admission of the findings contained in the orders.

The *Ex parte* Order and the Protective Order were admissible because they were not offered to prove that Taylor had, in fact, abused Chambers. Rather, defense counsel offered the orders to show that Taylor's alleged emotional injuries resulted from Chambers's pursuit of a restraining order against him, not from the defendants' conduct. Taylor testified that the incident giving rise to this lawsuit caused him severe emotional problems. Then Dr. Carl White, appearing on Taylor's behalf, testified that Taylor was extremely upset by his arrest and alleged mistreatment at the hands of the defendants. Dr. White admitted, however, that he was aware of a "restraining order" obtained by Chambers against Taylor and that, in addition to the events giving rise to this lawsuit, Taylor was also upset by "not being able to see his son," who lived with Chambers. Thus, the *Ex parte* Order and the Protective Order — which detailed Chambers's charges against Taylor and resulted in keeping Taylor away from his son — were offered to show their effect on Taylor's emotional state and were not hearsay. *See United States v. Leake*, 642 F.2d 715, 720-21 (4th Cir. 1981) (concluding that an out-of-court statement was not hearsay because it was offered to show the effect of the statement on the defendant's state of mind and not to prove the truth of the matter asserted in the statement). *Accord United States v. Sesay*, 313 F.3d 591, 599 (D.C. Cir. 2003). This evidence was plainly relevant to Taylor's claim for damages, and the district court properly admitted the orders into evidence with a limiting instruction.

Taylor also objected on the ground that the judicial findings contained in the orders were unduly prejudicial. *See* Fed. R. Evid. 403(b). Although judicial findings typically are deemed unduly prejudicial, *Carter v. Burch*, 34 F.3d 257, 265 (4th Cir. 1994), in this case Taylor alleged false arrest, thereby placing in issue all of the underlying facts surrounding his arrest. Taylor testified on direct examination that when he spoke to Chambers on the night of his arrest, he "never" threatened her and "never" told her that he would kick in her door.

This testimony made Chambers's allegations and the state court's orders particularly probative with respect to Taylor's credibility. Further, any prejudice that resulted from the official status of the findings was mitigated by Chambers's testimony, which actually undermined her own allegations of abuse.[4] *See Zeus Enters., Inc. v. Alphin Aircraft, Inc.*, 190 F.3d 238, 243 (4th Cir. 1999) (concluding that admission of ALJ findings was proper where "the probative value of the ALJ's decision [was] real and beyond dispute" and the party against whom the findings were introduced "introduced evidence to contradict the ALJ's findings").

Moreover, the danger of undue prejudice was diminished when the district court took the false arrest and malicious prosecution claims — the only claims relating to Taylor's relationship with Chambers — away from the jury. *Cf. Carter*, 34 F.3d at 265 (stating that admission of a court's opinion "would have been unduly prejudicial . . . because the judge's opinion decided the precise issue before the jury"). The district court's decision to admit this evidence was neither arbitrary nor irrational, and it should not be disturbed. *See Achiekwelu*, 112 F.3d at 753.

C.

Finally, Taylor challenges the district court's ruling allowing defense counsel to cross-examine him concerning a 1994 incident between Taylor and Chambers that resulted in his arrest for domestic abuse. Although Taylor was arrested, the charges were dropped and he was never convicted of any crime. Defense counsel read the charging document line by line, asking Taylor whether he agreed with the

---

[4]Chambers testified that on the night of the arrest Taylor did not threaten her or tell her he was going to kick down the door. She further testified that Taylor had not ever kicked her down a flight of stairs, tried to strangle her, stalked her, or otherwise threatened to hurt her. Chambers confirmed, however, that her friend Renee Brown, who was staying at her house on the night of the incident, told police officers that Taylor had committed these very acts of violence against Chambers. Chambers also confirmed that she never corrected Brown's statements to the police and that she signed the documents setting out allegations of domestic violence.

statements contained in the document. The district court subsequently referred to the document as having been admitted into evidence, and we will review the admission of this evidence for abuse of discretion. *Id.*

Taylor argues that this cross-examination was improper because it attempted to impeach a witness by using extrinsic evidence of conduct unrelated to the witness' character for truthfulness. Fed. R. Evid. 608(b) permits inquiry into specific instances of the conduct of a witness only if that conduct is "probative of truthfulness or untruthfulness." *United States v. McMillon*, 14 F.3d 948, 956 (4th Cir. 1994). We agree with Taylor that this cross-examination was not probative of his character for truthfulness and would not have been proper under Rule 608(b). *See Leake*, 642 F.2d at 718 (noting that perjury, fraud, swindling, forgery, bribery, and embezzlement are permissible topics of impeachment under Rule 608).

Nevertheless, this evidence and cross-examination were properly allowed to show Taylor's bias against the defendants. *See United States v. Abel*, 469 U.S. 45, 49-53 (1984) (permitting cross-examination of a witness concerning his membership in an organization to show bias, even where proof of his membership in that organization might have impeached his veracity directly). Taylor testified on direct examination that this incident caused him emotional damage: "There were nights I would wake up in a pool of sweat. I would think about what happened. Whenever I see an officer, particularly a white officer, it bothered me." Later on direct, Taylor testified that he filed this lawsuit because "I was done wrong. Not only was I done wrong, but I believe others have been done wrong." Although Taylor denies any bias against police officers, given the facts that the earlier charges were dropped and the police officer who made the arrest later apologized to him, the 1994 arrest — arising from a domestic dispute between Taylor and Chambers — related to conduct very similar to the conduct alleged in this case. Thus, the evidence would allow a jury to believe that Taylor had a bias against police officers who arrested him based on Chambers's allegations of domestic violence. Because the 1994 arrest was probative of Taylor's bias against the defendants, the district court committed no error in allowing this cross-examination and defense counsel's use of the charging statement.

Even if there were any error in this regard, we conclude that it was harmless. *See Taylor v. Virginia Union Univ.*, 193 F.3d 219, 235 (4th Cir. 1999); Fed. R. Civ. P. 61. The claims ultimately submitted to the jury did not involve Chambers specifically or domestic violence matters generally, and there was ample evidence from which the jury could reasonably conclude that a defense verdict was appropriate on those claims. Thus, we can say that the jury's verdict on Taylor's excessive-force and deprivation of clothing claims was not "substantially swayed" by the district court's allowance of this cross-examination. *See Taylor*, 193 F.3d at 235.

## III.

The district court properly rejected Taylor's *Batson* challenge, and its evidentiary rulings do not constitute an abuse of discretion. In sum, we find no error in the conduct of the trial that was "so grievous as to have rendered the trial unfair." *Bristol Steel*, 41 F.3d at 186. Accordingly, the judgment of the district court is

*AFFIRMED*.